MATTINGLY, INC., a Kansas Corporation, and Mattingly Pools, Inc., a Kansas Corporation, Plaintiffs–Appellees/Cross Appellants,

v.

BEATRICE FOODS COMPANY, Defendant–Appellant/Cross–Appellee.

Nos. 83–2206, 83–2207.

United States Court of Appeals, Tenth Circuit.

Dec. 24, 1987.

1548

Brian G. Grace, Wichita, Kan. (Susan K. McKee of Curfman, Harris, Stallings & Snow, Wichita, Kan., was also on the brief), for plaintiffs-appellees/cross-appellants.

George Leonard, Kansas City, Mo. (Russell S. Jones, Jr. of Shughart, Thompson & Kilroy, Kansas City, Mo., and Ronald Butler, Gerald G. Saltarelli of Butler, Rubin, Newcomer & Saltarelli, Chicago, Ill., were also on the brief), for defendant-appellant/cross-appellee.

Before HOLLOWAY, Chief Judge, MOORE, Circuit Judge, and THOMPSON, District Judge[*].

HOLLOWAY, Chief Judge.

Plaintiffs Mattingly, Inc. and Mattingly Pools, Inc. brought this action against Beatrice Foods Company to recover damages arising from their use of a pool-coating product, initially called Marble Plastic and later called Marbalon. The district judge tried the case without a jury and entered judgment for the Mattinglys, finding that defendant Beatrice had committed fraud and had breached its express warranties, and awarding actual and punitive damages. Beatrice appeals and plaintiffs cross-appeal.

## I

## THE TRIAL COURT'S FINDINGS AND CONCLUSIONS

Before turning to the appellate contentions we note the findings and conclusions stated in the trial court's unpublished (hereafter Mem.) opinion.

Mattingly, Inc. and Mattingly Pools, Inc. were closely-held Kansas corporations, founded by Charles Mattingly, Sr. in the Wichita, Kansas and Oklahoma City, Oklahoma areas respectively. They engaged in the construction and maintenance of swimming pools and the sale of swimming pool supplies. When he retired, Charles, Sr. turned the companies over to his eldest son, Charles, Jr. (Matt), who managed them with the help of his brothers, James and Givin.

The Mattingly companies experienced continuous growth in customers and sales volume from 1970 until 1977. At their peak, the companies employed a total of 80 persons and had about $ 2.5 million in annual sales. Mattingly, Inc. had at least 50 percent of the swimming pool construction and service market in the Wichita area and Mattingly Pools had 15 percent of the market in Oklahoma City.

Farboil Company, the manufacturer of Marble Plastic and Marblon, is one of 26 unincorporated "profit centers" within Beatrice's Chemical Division. In September 1972, George Gurkovic, a former Farboil employee, returned to Farboil and furnished it the original formula for Marble plastic. After conducting certain laboratory tests, Farboil decided to call the product Marble Plastic and to market it as a swimming pool coating. Farboil did not conduct any field tests on the product before marketing it.

---

In January 1974 Matt Mattingly first met Gurkovic, then Farboil's pool coating sales representative, at a pool contractors' convention in Anaheim, California. After hearing Gurkovic's sales talk, Matt ordered enough Marble Plastic to allow the Mattinglys to coat "a couple of pools" and observe the product's application and appearance. However, Farboil never filled the order and Matt had to place the order with Farboil again in February. Farboil had by this time replaced Gurkovic with a new sales representative for Marble Plastic, John Holman.

The first swimming pool the Mattinglys coated with Marble Plastic belonged to a Mr. Buchanan in Oklahoma City. After observing this pool and talking with his employees, Matt decided to use the Farboil pool coating system exclusively. However, approximately one month later, the Marble Plastic coating started peeling off the floor of the Buchanan swimming pool in large sheets. In July 1974 the Mattinglys solved this problem by following Farboil's suggestion, not included in the original instructions, to broom-finish the swimming pool floors to give them a better profile to which paint could adhere. Although this suggestion solved the initial adhesion problem, it required the Mattinglys to drain, clean and recoat the Buchanan pool and other pools without broom-finished floors.

Throughout 1974 the Mattinglys experienced staining and adhesion problems with the Marble Plastic coatings they applied to swimming pools. The coatings stained extensively. In addition, they blistered and came off in large pieces, especially on the steps and walls.

Recoating the pools already coated with Marble Plastic also created problems. For example, the Buchanan pool, which the Mattinglys recoated, experienced blistering and peeling within one to two months after recoating, and an epoxy coating recommended by Holman failed because it was chemically incompatible with Marble Plastic. The Mattinglys had to sandblast pools recoated with epoxy to remove the coating, causing them considerable expense and their customers considerable noise, dust and inconvenience. Customers also complained of staining and peeling in the spring of 1975 when the Mattingly companies' service departments began taking the covers off pools they had coated with the Marble Plastic base coat in 1974. The Mattinglys initially recoated these pools with more Farboil products at their own expense.

Sylvan Pools, a nationally recognized pool construction and supply company that was also a Farboil customer, also complained that Marble Plastic stained too easily and could not be cleaned. In November 1974, therefore, Farboil began producing and selling a clear top coat and renamed its product Marbalon. Farboil chemists, on the basis of laboratory tests, believed the acrylic polymer in the top coat would hinder the staining of the white base coat and that the two coats were chemically compatible so the top coat would adhere to the base coat. Again, however, Farboil did not extensively field test the product.

Although the new Marbalon coating system was supposed to eliminate the staining problems created by the white base coat alone, it had new problems of its own. As soon as the Mattinglys began having problems with Marbalon, they again contacted Farboil, which advised them that the problems were the fault of their own paint crews and assured them it would shortly introduce a new stain-remover to handle the staining problem. These representations led the Mattinglys to continue using Marbalon. However, when Farboil introduced their new stain remover, the Mattinglys tried it and found it unsatisfactory.

By fall of 1975, the increasing amounts of time, personnel and money the Mattinglys found necessary to honor their product warranties because of problems with the coating interrupted regular customer service work and disrupted their business. Mem. at 15–16. Matt therefore approached Holman and asked for financial assistance from Farboil. In November 1975, Holman told Matt he would help the Mattinglys, that Farboil had developed a new spray application system for the top coat, and that Farboil's other customers were not

having problems with the top coat or staining. In January 1976, after Matt delivered a letter to Farboil again asking for help, Holman told Matt he was leaving Farboil's employ, but he urged the Mattinglys to pursue their claims further with Beatrice. Edward Butch, Farboil's new National Swimming Pool Director and Holman's replacement, visited Matt in Wichita in February, 1976, and, shortly thereafter, Farboil gave the Mattinglys $ 3,500 in credit on bills Mattingly owed Farboil.

In the Spring of 1976, when the Mattinglys' service crews again removed the covers from customers' pools, they found "massive" staining and peeling problems with pools coated or recoated in 1975. Service crews again had to devote a substantial amount of time to warranty work, with some pools initially coated in 1974 receiving their third coat of Farboil product. In addition, by the spring and summer of 1976, Sylvan Pools and another Farboil customer, Delray Pools of Southern Florida, had stopped using Marbalon. Sylvan had to borrow approximately $ 1 million to cover warranty costs, and Delray had to close down its pool construction operations because of problems with Marbalon.

In July 1976 Matt went to Farboil's offices in Baltimore, Maryland, to discuss his complaints about Marbalon with Farboil. He met with Butch, who eventually agreed to give him a $ 4,000 credit. Before final approval of the credit, however, Butch left the office to confer with his superior, Hendrickson. Hendrickson was furious about the arrangement. He "stormed into Mr. [Butch's] office and essentially accused Mr. Mattingly of stealing from Farboil, in that plaintiffs were the only 'sons of bitches who got any kind of deal from us.'" 2 R. 578 During these negotiations, Butch also represented to the Mattinglys that they were the only customers having problems with the Farboil products.

In the Fall of 1976, Farboil sent the Mattinglys a free sample of about 25 gallons of a new tinted topcoat it had developed. Farboil's representative told the Mattinglys that the product could be painted over pools that were coated with Mar-

balon, although the technical data sheet for the tinted topcoat, issued in October 1976, advised that it could only be applied over a pool freshly coated with base coat. The Mattinglys were the only Farboil customers who purchased the new tinted topcoat.

The new topcoat was to be applied with a sprayer, but the painters the Mattinglys hired to do this work complained that it clogged their spray guns. In addition, the topcoat often developed stains and blisters. When crews began uncovering pools in the spring of 1977, they again faced a barrage of customer complaints. The new tinted topcoat did not solve the Mattinglys' warranty problems.

By early summer of 1977, the Mattinglys stopped using Farboil's products. By the end of 1977, Mattingly Pools in Oklahoma City virtually closed its operations. Subsequently it went into involuntary bankruptcy. Mattingly, Inc. in Wichita ceased operations in 1978. Except for some small sales, Farboil stopped producing and marketing its pool coating products by summer of 1978. All sales ceased in 1980.

On the basis of expert testimony by Dr. Ignacios Metil, a chemist specializing in industrial coatings and paints, the judge found that water based coatings such as Marble Plastic and Marbalon were "inherently unsuitable as an immersion coating, because by nature it would be indemically too porous to prevent staining of the cement substrate." Mem. at 24. The water-based coating would also raise the water's ph level high enough to allow iron oxide in the water to stain the cement, and the porosity of the coating would make cleaning the stains impossible. Although the clear topcoat theoretically could solve the problem, its translucent quality and the need for uniform application made it extremely difficult to apply in the field. The court found that Marble Plastic was defective because of its tendency to stain; that although the Marbalon 4–coat system was theoretically a viable product, it required perfect application which could only be achieved under laboratory conditions; and that Farboil could have field-tested the

coatings and discovered these problems but did not. Mem. at 24–26.

The trial judge also noted the testimony of Dr. Thames, an organic chemist. He testified for Beatrice that the failures associated with Farboil's coatings were primarily due to the Mattinglys' failure to completely remove Noxcrete, a form-release agent the Mattinglys used during their construction process, from the concrete surfaces of the pools before applying the Farboil coatings. Dr. Thames speculated that the Noxcrete would migrate into grouting the Mattinglys used to smooth out irregularities in the surface and cause stains and paint chipping. Mem. at 27. Although the judge found Dr. Thames' general theories "valid," he determined that they did not account for the Mattinglys' problems because Sylvan Pools and Delray Pools also had problems with Farboil products, but they did not use Noxcrete. The judge noted that only one of the Mattingly pools observed by Dr. Thames was coated with Marble Plastic, and he did not find Noxcrete residue in the paint chip from that pool. Mem. at 27–28.

The trial judge concluded that the Mattinglys presented clear and convincing evidence that their initial purchase of Farboil coatings was based on the fraudulent misrepresentations of Farboil employees, upon which they justifiably relied, and that the Mattinglys continued using the products because of Farboil's continuing fraudulent reassurances that their problems with the coatings would be solved. Mem. at 29, 49. The judge also held that Farboil had breached express warranties to the Mattinglys. Mem. at 51–58. The court awarded actual damages of approximately $ 1.6 million and punitive damages of $ 1 million. Mem. at 66–72, 79–80.

Both sides filed post-trial motions to amend the judgment or to make additional findings, which the trial court denied, and this timely appeal and cross appeal followed. Numerous challenges are made to the judge's findings and conclusions and we will consider the principal attacks on them in detail.

## II

### LIABILITIES ISSUES

#### A. Liability on the fraud claims

Beatrice says the Mattinglys failed to prove certain elements of their fraud claim by clear and convincing evidence, as required by Kansas law. *See Stauth v. Brown*, 241 Kan. 1, 734 P.2d 1063, 1069 (1987); *Nordstrom v. Miller*, 227 Kan. 59, 605 P.2d 545, 552 (1980).[1] Beatrice also claims that the applicable statute of limitations, K.S.A. 60–513, barred the Mattinglys' fraud claim.

#### (1) The Misrepresentations

First Beatrice attacks the findings the trial judge made with respect to George Gurkovic's representations at the January 1974 Anaheim pool convention. Since Beatrice has failed to demonstrate these findings were clearly erroneous, we uphold them.

#### Gurkovic's Statements That Marble Plastic Was "Easy To Apply" And "Easy To Recoat"

George Gurkovic told Matt at the Anaheim convention in January 1974 that Marble Plastic was an excellent coating, it was easy to apply, and an epoxy coating would go right over any places that might go bad in four or five years. X R. 489–490.

■ Beatrice says these statements were "puffing" or "sales talk" rather than factual misrepresentations. Appellee's Opening Brief at 21. Under Kansas law, however, "where the terms of dealing are

---

1. The term "clear and convincing evidence" means:

[T]he witnesses to a fact must be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be

clear, direct and weighty, and the witness must be lacking in confusion as to the facts at issue.

*Nordstrom v. Miller*, 227 Kan. 59, 605 P.2d 545, 552 (1980), *quoting Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 596 P.2d 816, 824 (1979).

not equal, and the representor has superior knowledge of the subject, a statement which would otherwise be one of opinion will be regarded as one of fact." Mem. at 44, *quoting Fisher v. Mr. Harold's Hair Lab, Inc.,* 215 Kan. 515, 527 P.2d 1026, 1033 (1974). The district judge found that Farboil possessed superior knowledge of Marble Plastic's ease of application and that application requirements were "critical" to the Mattinglys. Mem. at 44. These findings are supported by substantial evidence and the judge did not err in his conclusion that Gurkovic's statements were misrepresentations of fact and not sales talk.

■ Beatrice also argues that Gurkovic did not make the misrepresentations with fraudulent intent. Appellee's Opening Brief at 20–21. In Kansas, "[a]ctionable fraud includes any false representations on a material fact, knowingly or recklessly made...." *McGuire v. Gunn,* 133 Kan. 422, 300 P. 654, 656 (1931), *quoted in Fisher,* 527 P.2d at 1032. The trial judge found that Gurkovic's representation that Marble Plastic "was easy to apply and could be easily recoated" was a material misstatement "which he knew was untrue or which was made with reckless disregard for the truth." Mem. at 43.

Ample evidence supports the finding that Gurkovic acted knowingly or recklessly when he made the statements concerning ease of application and recoatability. Numerous letters and memoranda Gurkovic either sent or received in June and October 1973, well before the Anaheim convention, described "Marble Plastic failure" resulting from "faulty application over dirty surfaces," Marble Plastic which was "not mixed and strained properly" before application, loss of adhesion as a result of improper drying procedures before and after application, complaints that Marble Plastic was "watery" and "very difficult to handle," and a variety of other problems and complaints. XXVIII R. 710101–107.

Beatrice's attack on the district judge's finding that Gurkovic's statement was reckless fails. While Beatrice correctly points out that the trial judge found that "defendant's testing indicated the product was suitable under laboratory conditions," Mem. at 47, this does not negate the finding that no field testing occurred and that Gurkovic's representations about ease of recoating in the absence of such testing were reckless.

### Gurkovic's claim that Sylvan Pools was a Farboil customer

■ The trial judge found that at the Anaheim convention Gurkovic told Matt that Sylvan Pools "was already a Farboil customer, when Gurkovic knew Sylvan had not yet decided to buy Farboil coatings" but was only "considering" them. He found Gurkovic "obviously" did this because he knew Sylvan was nationally recognized and its use of Marble Plastic would induce other pool contractors like the Mattinglys to use it. Mem. at 9, 42. The judge found Sylvan did not actually begin using Marble Plastic until March 1974. *Id.* at 9.

Beatrice claims there is no evidence to support the judge's finding that Gurkovic's statement to Matt that Sylvan was a Farboil customer was a material misrepresentation. Beatrice says that Herman Silverman, Sylvan's president, told Farboil sometime in January 1974 that it was "committed" to become a Farboil customer and claims the record shows no evidence that Gurkovic made his statement before Silverman made this commitment. Moreover, Beatrice says there is no evidence the Sylvan name influenced Matt when he decided to buy Marble Plastic. Appellee's Opening Brief at 20 & 20 n. 8.

Silverman did testify at trial that he "[t]old [Farboil] sometime in January" 1974 that Sylvan was going to use Marble Plastic. Sylvan also communicated this information to Gurkovic, although Silverman did not say when. XII R. 607. However, Silverman's testimony in an earlier action brought against Farboil in Florida indicates that Sylvan's use of Marble Plastic was in its southern division closest to the Farboil plant so that Sylvan could see whether it would fit in with Sylvan's method of construction on a mass scale and whether the

cost and quantities suggested were true. XXXII R. (Silverman test.) at 10.

Silverman further testified at trial that Sylvan's southern division started using the product around Laurel, Maryland in "early spring" and coated "[a]bout 200" pools with it. XII R. 607–608. In testimony from the Florida action introduced at this trial, Silverman said Sylvan started coating swimming pools with Marble Plastic in "[l]ate February or early March" 1974 and coated "[a]bout 300" pools. XXXII R. Testimony of Herman Silverman, *Delray Pools v. Farboil Co.*, No. 76–2481 CA(L) 01E (Palm Beach Co. Fla. Cir.Ct., Aug. 31, 1978) at 11.

Matt testified at trial that Gurkovic told him at the Anaheim convention that Sylvan was already building about 1,200 pools per year using Marble Plastic, and he said he was impressed with Sylvan's size. XII R. 544–547. The district judge's findings that Gurkovic's representations about Sylvan induced Mattingly to give Marble Plastic more serious consideration than he otherwise would have, and that Sylvan was only considering such use and had not, as Beatrice argues, made a "commitment" to the product, are reasonable inferences from the evidence. *See State Distributors, Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 411–12 (10th Cir.1984). Ample evidence supports the district judge's findings about Gurkovic's representations to Matt in January 1974.

*Farboil's representations to the Mattinglys that marble plastic's problems resulted from faulty application*

■ The district judge found that Farboil's representatives made a "most important fraudulent statement" when, in response to the Mattinglys' complaints about Marble Plastic, they "always told" the Mattinglys the problems arose from the Mattinglys' application techniques rather than from defects in the coating itself. Mem. at 45. Beatrice argues there was no evidence Farboil representatives "always told" the Mattinglys this because Matt's testimony refers to only two such statements and that there is no evidence Farboil knew

these statements were false when its representatives made them. Appellee's Opening Brief at 21–22.

The district court did not err in its characterization of Farboil's response to the Mattinglys' complaints about Marble Plastic. Beatrice concedes that John Holman, Gurkovic's successor at Farboil, told Matt at a pool show in November of 1975 that "they [were] not having any trouble with the top coat and the staining anywhere else." XIV R. 869–870. A similar statement was made at a meeting in July 1976. XIV R. 908–909. In addition, Matt testified that he was told up to July 1976 that the Mattinglys were the only customers with problems. XVI R. 881, 899, 908–09; XVI R. 1056–57. Matt's brother James also testified the Mattinglys received such statements from Farboil representatives. X R. 326, 340, 414.

Similarly, the record contains evidence that Farboil knew Marble Plastic had problems before and during the period its representatives made these representations. George Gurkovic knew there were problems when he brought the product from his previous employer. XXVIII R. 710101–107. Holman testified in depositions taken in earlier lawsuits that before he left Farboil in December 1975, that pool companies were experiencing problems with Marble Plastic and that Holman had decided these problems were with the product rather than the pool companies' application processes. XXXII R. Deposition of Holman Jul. 15, 1977, *Delray Pools, Inc. v. Farboil Co.*, No. 76–2840 CA(L) 01E (Palm Beach Co. Fla.Cir.Ct.) at 39–41, 45–47, Deposition of Holman Oct. 30, 1978, *KDI Sylvan Pools, Inc. v. Farboil Co.*, No. 77–149 (E.D. Pa.) at 145. Holman told the Mattinglys to try to obtain redress from Farboil and Beatrice. Herman Silverman's testimony establishes that, although Sylvan Pools had continued purchasing the product, it, too, was having problems and telling Farboil about them in 1976. XXXII R. Silverman Testimony, *Delray Pools v. Farboil Co.*, *supra*, at 26–27.

*Gurkovic's claim that Farboil developed Marble Plastic*

The judge found that at the Anaheim pool convention meeting in January 1974, Gurkovic represented that Farboil developed and tested Marble Plastic on its own when he knew he had brought the product from his previous employer. Mem. at 42. Beatrice claims the evidence is not clear and convincing that Gurkovic told Mattingly at the pool convention that Farboil developed and tested Marble Plastic. Appellee's Opening Brief at 19.

The findings of the trial judge are not clearly erroneous on this point. Brochures distributed by Farboil at the pool convention glowingly described Farboil's swimming pool finishes, including its "marble plastic plaster finish." *See* I App. 138–41; I App. 161–64. Farboil's "quality finishes," these brochures stated, "were [d]esigned by [p]rofessionals with many years experience in the Swimming Pool Industry." I App. 141; I App. 164. One of the pamphlets stated that Farboil's "coatings [had] proven themselves through years of usage by professional pool people." I App. 141. The brochures also prominently stated that Farboil was a division of Beatrice Foods, I App. 138, 141; I App. 164, and had produced "quality coatings since 1913." I App. 138; I App. 161. In sum, the literature distributed by Farboil conveyed a clear impression that Farboil's products were of the highest quality. It was inherent within this calculated impression that professionals at Farboil had developed its coatings; and that the performance of the coatings was well known to those professionals. From his visit with Gurkovic, Matt was left with the impression that Farboil was experienced with regard to pool problems. XI R. 553.

Viewing the evidence as a whole, we are not left with a definite and firm conviction that a mistake was made in the findings.

*(2) Reliance on the misrepresentations*

■ The trial judge found that the Mattinglys "justifiably relied" on Farboil's misrepresentations because "Farboil's products were backed by Beatrice Foods Company, a giant, well-respected, and consumer-oriented company." Mem. at 29. Beatrice claims that no evidence supports the finding that Beatrice's name played a significant part in the Mattinglys' decision to use the Farboil coatings and that there is no evidence the Mattinglys relied on Farboil's advertising, which contains Beatrice's name. Appellee's Opening Brief at 23.

The record contains ample evidence that Farboil used the Beatrice name prominently in its advertising. I App. at 138, 141, 164. Matt Mattingly testified about Gurkovic's statements at the Anaheim meeting and the impression Matt had of Farboil's experience with pool problems. In addition, Matt testified that in early 1974 Holman made the claim that the company was an old line paint manufacturing company and that swimming pool problems were not new to them, and not new to Holman who was "an expert." I App. at 165–66.

With respect to the reliance issue, we also note that Matt testified that he had not been told in July 1976 that Delray Pools in Florida and Sylvan Pools had stopped using the product or that Farboil had offered to recoat some pools for Delray. XIV R. 909–910. He testified that had he known that Delray, Sylvan and some Pennsylvania people had quit using Marbalon by July 1976 because of problems similar to his, he would not have continued to try to use the product. XIV R. 916.

The trial judge did not err in finding that Matt's reliance on Farboil's misrepresentations was reasonable. The evidence supported such an inference and finding. There was proof that the Mattinglys were not advised of any "danger signals" about the product and the finding of justifiable reliance was not in error. *Sippy v. Cristich,* 4 Kan.App.2d 511, 609 P.2d 204, 208 (1980).

*(3) The statute of limitations on the fraud claims*

Beatrice argues that the two year statute of limitations applicable to fraud actions, K.S.A. § 60–513, bars the Mattinglys' fraud claims. According to Beatrice, Matt

knew of facts that should have led him to discover Farboil's fraud more than two years before March 10, 1978, the date the Mattinglys filed suit. Beatrice points to evidence that Mattingly's crews were having problems in 1974 and 1975; that Matt knew in July 1975 that Sylvan was having problems; and that in September 1975 Lejewski, a Farboil technician, told Matt he should not have recoated Marble Plastic with epoxy and that some Florida pools were having problems. Appellee's Opening Brief at 25. There was also testimony that Givin Mattingly called Sylvan Pools in July of 1975 and found out that Sylvan was having problems. XVII R. 1145, 1148–51.

In Kansas, " '[d]iscovery of the fraud' has been defined ... to mean the time of actual discovery or when, with reasonable diligence, the fraud could have been discovered." *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 643 P.2d 100, 108 (1982). Nevertheless:

> It ... [implies] actual knowledge, not mere suspicion of wrong. Further, even though his suspicions might have been aroused a party may be lulled into confidence by certain representations and forego any further investigation.

*Id.*

■ The trial judge found that "any reasonable suspicions on plaintiffs' part were lulled by defendant's steadfast representation that only plaintiffs had complaints, and defendant's apparent willingness to help with plaintiffs' warranty expenses." Consequently the court concluded that the Mattinglys neither knew of Farboil's fraud before March 10, 1976 nor had knowlege of sufficient facts to require further investigation. Mem. at 49. These findings have ample evidentiary support.

### B. Liability on the breach of warranty claims

■ The district judge found that Farboil made express warranties to the Mattinglys that Marble Plastic and Marbalon were easy to apply and easy to recoat. He also found that Farboil breached these warranties. Mem. at 54. Again Beatrice argues that the representations that the coatings were easy to apply and easy to recoat were merely sales talk or puffing. Consequently Beatrice says the finding by the trial court that Farboil breached these express warranties is clearly erroneous; that instead the evidence is clear that the Mattinglys' problems were caused by application errors. Appellee's Opening Brief at 27–31.

Under Kansas law a seller gives an express warranty when he makes an "affirmation of fact ... to the buyer which relates to the goods and becomes a part of the basis of the bargain...." Mem. at 51, *quoting* K.S.A. 84–2–313. The plaintiff's burden is to show that the goods did not have the properties warranted. *Huebert v. Federal Pac. Elec. Co.*, 208 Kan. 720, 494 P.2d 1210, 1215 (1972). In discussing the warranty issue, the district judge reiterated his finding that Farboil's representations about ease of application and recoating were factual, Mem. at 52, a finding we have already held is not clearly erroneous. In addition, the judge found that "the application of the finish coating is an integral part of any pool builder's construction process" so that "quickly achieving complete coverage is a prime factor when selecting a coating." Mem. at 52. This finding meets the requirement that the representation form a part of the basis of the bargain.[2]

2. The comments to the Uniform Commercial Code and to the Kansas Commercial Code support the conclusion that the "basis of the bargain" test is met here. The Code test is "much less stringent" than the traditional reliance test; "[t]he buyer need not show any specific or particular reliance." UCC § 2–313, K.S.A. 84–2–313, Kansas Comment (1983). The official UCC comment states:

> Concerning ... a seller's opinion or commendation under subsection (2), the basic question remains the same: What statements of the seller in the circumstances and in objective judgment become part of the basis of the bargain? ... [A]ll of the statements of the seller do so unless good reason is shown to the contrary. The provisions of subsection (2) are included, however, since common experience discloses that some statements or predictions cannot fairly be viewed as entering into the bargain.

UCC § 2–313, K.S.A. 84–2–313, Official UCC Comment, ¶ 8.

Beatrice's argument that the Mattinglys' application errors caused their problems rests on two grounds. First Beatrice claims that the evidence shows that the staining the Mattinglys complained of resulted from their crews' failure to apply the coatings evenly. Second Beatrice contends that the testimony of its expert, Dr. Thames, conclusively demonstrated that the coatings' tendency to flake and peel resulted from the presence of noxcrete on the cement surfaces of the pools the Mattinglys coated. Appellee's Opening Brief at 28–32. Beatrice made these same arguments to the district judge. He acknowledged that if the Mattinglys' damages resulted from their failure to follow instructions, Farboil could not be held liable for breach of warranty. However he found that:

> The characteristics of defendant's coatings were so inadequate for their intended use that it was impossible to achieve success a majority of the time in the field when directions were scrupulously adhered to. Even defendant's own representatives were unable to obtain satisfactory results when they demonstrated application techniques for Marble Plastic on plaintiffs' pools.

Mem. at 53.

The judge rejected Dr. Thames' explanation that noxcrete caused the Mattingly pools to peel and flake because he found that other pool companies which did not use noxcrete experienced the same problems as plaintiffs and Dr. Thames did not find noxcrete residue on the paint chips from the only Mattingly pool he observed that was coated with Marble Plastic. Mem. at 26–28. Beatrice's arguments on appeal do not take account of these findings, which are not clearly erroneous. Furthermore there was testimony by Matt Mattingly detailing the coating and recoating problems the Mattinglys had after April 1975 and the staining, flaking, and peeling that occurred in the pools. I App. 223–24, 227–30.

We hold that the findings of breaches of express warranties were not clearly erroneous.

## C. The defense of accord and satisfaction

The district judge found that the $ 4,000 credit Farboil issued to the Mattinglys after Matt's July 17, 1976 meeting with Butch at Farboil's Baltimore headquarters "in full and final payment for all recoating jobs necessary because of the problems you had with Marbalon," Mem. at 32, *quoting* Pl. exh. 49, and the previous credit for $ 3,500 covering claims prior to the 1976 swimming pool season were an accord covering all claimed damages arising before August 3, 1976. Mem. at 33. However, he rescinded the agreement because Farboil had procured it through fraud. Mem. at 35.

The trial judge found that Butch told Matt that the Mattinglys were the only Farboil customers having problems with Farboil's pool coatings and that the Mattinglys' problems resulted from application errors. Hendrickson, Butch's superior, supported Butch's statement when he said in Matt's presence that the Mattinglys were the only Farboil customers receiving "any special deals or compensation" from Farboil. Moreover, Farboil's representatives knew these statements were false because they knew that Sylvan and Delray Pools had both stopped using Farboil's coatings in June 1976 and that Sylvan pool owners and others were complaining to Farboil about coating problems. The judge concluded that these statements were material and that the Mattinglys reasonably relied on them in deciding to continue using Marbalon. Mem. at 35–36.

Beatrice argues that the trial court's finding that the agreement was procured by fraud is clearly erroneous. According to Beatrice, there is no evidence that Butch told Matt at the July meeting that he was the only one having problems. Furthermore, Matt could not have reasonably relied on any such statement since the evidence shows he knew of the problems others were having. Appellee's Opening Brief at 26–27.

The evidence supports the judge's findings. Matt testified that during the July

17 meeting Butch left to consult with Hendrickson, who then came "storming" into the meeting room and angrily shouted that Matt was the only "son of a bitch" getting credits from Farboil, leaving Matt to "figure[ ] ... I better take what I can, and that's all I can do." XIV R. 907. Matt said he left the meeting thinking "we were the only ones having any trouble at all, and we were getting a four thousand dollar deal that nobody [else] had gotten...." XIV R. 908.

The evidence also supports the trial judge's finding that Matt's reliance on these representations was reasonable. Farboil's continual reassurances lulled Matt into a false sense of security, even though he knew of complaints by Sylvan and others. In sum, the district judge's finding that the accord and satisfaction were induced by fraud is not clearly erroneous.

■ Beatrice argues further, for the very first time in its reply brief on appeal, that the Mattinglys cannot rescind the accord and satisfaction on the ground of fraud because they did not tender repayment to Beatrice of the amount received in satisfaction before initiating this suit, $3,500.00 and $4,000.00. Reply Brief of Appellee Beatrice Foods Company at 2–3. *See Small v. Chemlawn Corp.*, 584 F.Supp. 690, 693 (W.D.Mich.1984), *aff'd,* 765 F.2d 146 (6th Cir.1985).

We are not persuaded by the untimely argument. Because Beatrice failed to raise the defense at trial, the Mattinglys' not having tendered the amount received in the alleged accord and satisfaction cannot now be raised as an affirmative defense. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 703 F.2d 1152, 1172 (10th Cir.1981) (en banc), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); *Investors Preferred Life Ins. Co. v. Abraham,* 375 F.2d 291, 295 (10th Cir.1967) (citing *Chicago & North Western Ry. Co. v. Continental Oil Co.,* 253 F.2d 468, 473 (10th Cir. 1958)); *see also Montgomery v. Professional Mut. Ins. Co.,* 611 F.2d 818, 820

(10th Cir.1980); 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1394 at 872 (1971). Moreover, there is an exception to the tender rule in the *Small* case that applies here. From all that appears on this point, Mem. Op. 18–19, 21–22, the Mattinglys received no cash; they only received a reduction on the amount owed to Beatrice for the defective product. In effect, they were only "given" more defective material. In such an instance, tender is not necessary. *Ellsworth v. Trinkle,* 96 Kan. 666, 153 P. 543, 544 (1915).

In sum, we reject the arguments that the alleged accord and satisfaction is a bar to the damage awards.

## III

### DAMAGES ISSUES

Due to the findings of fraud and breaches of express warranty, the trial judge awarded both compensatory and punitive damages. The court concluded that if Beatrice's product had performed as represented instead of causing extensive damages, the Mattingly companies would still be in existence. Accordingly the compensatory award was made to compensate for such destruction of the Mattingly companies' business and other resulting damages. The court also found punitive damages proper.

### A. COMPENSATORY DAMAGES

#### (1) The claim for compensatory damages for destruction of the Mattingly Companies' value

The trial judge awarded compensatory damages to the Mattinglys for the going concern value of the businesses; for the plaintiffs' outstanding liability to trade creditors as of July 1, 1982; and for past warranty expenses incurred by the Mattinglys. In addition, the trial court awarded compensation for third-party claims by pool owners arising from the use of Marble Plastic and Marbalon. Mem. at 79.

On appeal, Beatrice objects to the trial court's award of damages on several grounds. In particular, it argues that the

award to the Mattinglys of compensation for their trade creditor liabilities, and the award for the pool owners' claims, were improper. We will address each of these objections in turn.

### The trade creditor liabilities

Beatrice's challenge to the trial court's award of the Mattinglys' trade creditor liabilities makes a broad-based attack on the trial court's method of calculating compensatory damages for the destruction of the Mattinglys' businesses. The trial court said that since Beatrice was responsible for the destruction of the businesses, Beatrice "must pay plaintiffs the [market] value of their business[es] as of" December 31, 1977, "just as any theoretical buyer [would]...." Mem. at 69–70. The market value of the businesses, the judge determined, included the value of both their assets and their liabilities:

> As a practical matter, to fully compensate plaintiffs, Beatrice must buy the two businesses, which necessarily means buying both assets *and* liabilities. Commonly, when an ongoing business is sold, the buyer assumes and becomes responsible for the current liabilities of the newly acquired enterprise. The Court believes it just and equitable that defendant be liable for plaintiffs' trade liabilities just as any theoretical buyer of plaintiffs would be.

Mem. at 69–70.

In response, Beatrice notes that the district court cited no authority for its "forced sale" theory. Moreover, Beatrice contends that the trial court's calculation is fatally flawed. "[A] buyer of a business who assumes the liabilities," Beatrice emphasizes, "also *receives* the *assets* with which to pay the liabilities.... Unlike the District Court's hypothetical buyer, Beatrice never received these assets or any credit for them." Brief of Appellee at 33.[3]

■ We agree with Beatrice that the trial court's "forced sale" method of calculating the fair market value of the Matting-

lys' companies was in error. The proper measure of recovery for the destruction of a business is the *"difference between the ... market value of the business before and after the injury." Sawyer v. Fitts*, 630 S.W.2d 872, 874 (Tex.App.1982) (emphasis added). *Accord Taylor v. B. Heller & Co.*, 364 F.2d 608, 612 (6th Cir.1966) ("[D]amages for destruction of a business [are] measured by the difference between the value of the business before and after the injury or destruction."); *Wagenheim v. Alexander Grant & Co.*, 19 Ohio App.3d 7, 19 O.B.R. 71, 482 N.E.2d 955, 967 (1983) ("When an established and ongoing business is wrongfully injured or destroyed, the correct rule for determing the recovery should be the difference between the value of the business before and after its injury or destruction."). In determining such values before and after destruction of the business, market value should be used. *See Restatement (Second) of Torts* § 912, illustration 10 (1977). "As a general rule, market value is the highest price a purchaser is willing to pay for property, not being under compulsion to buy, and the lowest price a seller is willing to accept, not being under compulsion to sell." *United States v. Hatahley*, 257 F.2d 920, 923 n. 2 (10th Cir.1958). *See also Wharton, Aldhizer & Weaver v. Savin Corp.*, 232 Va. 375, 350 S.E.2d 635, 636 (1986); *Onego Corp. v. United States*, 295 F.2d 461, 463 (10th Cir.1961).

■ In determining the market value of a business, a court should not merely consider the corporation's book value. *See Liddle v. Liddle*, 140 Wis.2d 132, 410 N.W.2d 196, 202 (Wis.App.1987) ("[The plaintiff] merely asserts that the fair market value of Bradway's interest is determined by subtracting liabilities from asset values.... [T]hat method of evaluation ... may describe 'value' but not 'fair market value.' "). Rather, a court should consider all of the elements which comprise the business' "market value." *See Hatahley*, 257 F.2d at 923 ("In arriving at a fair market

---

3. We note that the record contains some conflicting evidence about various Mattingly properties such as land, trailers and frames that might have had value. The findings do not address these.

value of destroyed animals, the court should consider evidence of the availability of like animals, together with all other elements which go to make up market value.").[4]

▮▮▮ Here the trial court made two fundamental errors in determining the proper measure of recovery for the destruction of the Mattinglys' businesses. First, the court calculated the value of the businesses "as of December 31, 1977," the date on which the two corporations ceased doing business. Such an approach would be correct where the injury occurred instantly from one wrong such as one act of arson. Here, however, the damage resulted over a protracted period of time. On December 31, 1977, the businesses had suffered the deleterious effects caused by Beatrice's products for more than three years. As a consequence, any valuation on December 31, 1977 would fail to account for the decline that ensued after the Mattinglys began using Beatrice's products. On remand, therefore, in determining the proper measure of damages for the destruction of the Mattinglys' businesses, the trial court should consider the evidence, hold any hearings deemed necessary to determine the companies' value before and after the continuing wrongs and make findings concerning the difference in market value of the companies from 1974 to 1977.

▮▮▮ The trial court's second fundamental error was its adoption of the "forced sale" theory, which unconditionally included the total amount of the trade liabilities as an element of the businesses' value. This theory is unsupported by the case law. While claims by creditors may be helpful in determining the value of a business, they can not by themselves be the basis of a recovery. *Wagenheim v. Alexander Grant & Co.*, 19 Ohio App.3d 7, 19 O.B.R. 71, 482 N.E.2d 955, 968 (1983).

In sum, the trial court's proceedings on remand, as deemed necessary, and its dam-

ages findings should be directed to awarding compensation on the correct measure of damages—the difference between the value of the companies before and after the wrongs.

### Warranty expenses incurred by the Mattinglys

The trial court awarded Mattingly, Inc. $115,591.54 and Mattingly Pools, Inc. $74,203.28 for their "Incurred Warranty Expenses." Mem. at 79. At the same time, however, the trial court based its determination of the market value of the Mattinglys' businesses on the plaintiffs' experts' testimony in which they fed back in the warranty costs as income, enhancing the value of the businesses. *See, e.g.,* IX R. 242; IV App. 1115. This was an improper duplication and must be corrected on remand.

### (2) The Pool Owner's Claims

▮▮▮ The district judge, relying on *F. Hammer Paint Co. v. Glover*, 47 Kan. 15, 27 P. 130 (1891), also awarded $ 653,401.76 to the Mattinglys as "damages equivalent to [their] liability to pool customers with uncompleted warranty work." Mem. at 72. On appeal, Beatrice argues that such damages are not recoverable for two reasons. First, Beatrice contends that the Mattinglys had no legal liability to the pool owners arising from the defective coatings of the swimming pools. Any action by the pool owners, Beatrice posits, would be one for negligence and thus governed by Kan.Stat. Ann. § 60–258a (1983), the Kansas comparative negligence statute. That statute abolishes joint and several liability among tortfeasors, and assesses damages based on proportionate individual liability. *See* Kan.Stat.Ann. § 60–258a(d) (1983); *Hefley v. Textron, Inc.,* 713 F.2d 1487, 1496 (10th Cir.1983). If Beatrice was the negligent tortfeasor—and the Mattinglys were, like the pool owners, innocent victims—the Mattinglys would incur no liability under Kan.

---

**4.** The trial court properly considered some of the elements that comprised the businesses' "market value." For instance, in his calculation, the judge included both the good will of the businesses and the past warranty costs incurred by the Mattinglys. On remand, the court should consider these, and all other appropriate elements, as comprising the market value, and make the comparative analysis required by law.

Stat.Ann. § 60–258a. Consequently, the Mattinglys are not entitled to indemnity from Beatrice.

We feel it is illogical for Beatrice to assert its own negligence as a defense to a claim for indemnity, and a distortion of the equitable purposes underlying § 60–258a. The doctrine of comparative negligence was developed to soften the harsh all or nothing rule of contributory negligence. *Kennedy v. City of Sawyer*, 228 Kan. 439, 618 P.2d 788, 796 (1980). Comparative negligence "provides a system for allocating responsibility for an injury while still serving the social policy of not allowing a [tortfeasor] to escape liability ... merely because of slight culpability on the part of the [victim] in bringing about the injury." *Id.* at 797. Here, under the application of the statute advocated by Beatrice, it would not be the Mattinglys' "slight culpability" that would shield Beatrice from liability. Rather, Beatrice would be protected from liability because of the Mattinglys' total innocence. This result, we believe, is untenable.

Beatrice's argument must be rejected for a further reason. Claims against the Mattinglys by the pool owners would arise from the Mattinglys' failure to properly construct and maintain the swimming pools. As such, the actions would be claims for breach of contract. Comparative negligence statutes do not apply to breach of contract cases although fault does play some part in contract actions in that it may bear on the broader question of damages. *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 666 P.2d 192, 200–01 (1983); *Broce-O'Dell Concrete Prod., Inc. v. Mel Jarvis Constr. Co.*, 6 Kan.App.2d 757, 634 P.2d 1142 (1981).

■ Beatrice also argues that any obligation owed by the Mattinglys to the pool owners was voluntarily assumed. According to Beatrice, the Mattinglys could have legally avoided any "obligation" to the pool owners either by raising a statute of limitations defense against the pool owners, or by asserting the "full disclaimer of any liability for the coatings used on the pools," Appellee's Opening Brief at 40, contained in the contracts between them and the pool owners. Instead of asserting these defenses, Beatrice contends, the Mattinglys chose to honor their business obligations. Indeed, they went so far as to actively solicit claims by the pool owners. As a consequence, the Mattinglys' obligation to the pool owners arose voluntarily; and as volunteers, the Mattinglys can not now attempt to shift their responsibility to Beatrice.

Beatrice's argument presumes too much. While the general rule is that a volunteer who pays the debt of another without request may not recover the voluntary payment from the person owing the obligation, *see e.g., Rawson v. City of Omaha*, 212 Neb. 159, 322 N.W.2d 381, 384 (1982); *In re Dragonas' Estate*, 35 Misc.2d 300, 230 N.Y.S.2d 54, 55 (Sur.Ct.1962), Beatrice's corollary argument—that the Mattinglys were volunteers because they were not under an indisputable legal liability to compensate the pool owners—must be rejected. "A volunteer is one who, without interest to protect, or without a legal *or moral* obligation to pay satisfies the debt of another." *Trinity Universal Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 246 Ark. 1021, 441 S.W.2d 95, 97 (1969) (emphasis added). *Accord Mosher v. Conway*, 45 Ariz. 463, 46 P.2d 110, 113 (1935); *Kramer v. American Fidelity & Casualty Co. of Richmond, Va.*, 165 A.2d 924, 926 (D.C. Mun.App.1960); *Ragan v. Kelly*, 180 Md. 324, 24 A.2d 289, 295 (App.1942); *Massachusetts Bonding & Ins. Co. v. Car and Gen. Ins. Corp.*, 152 F.Supp. 477, 482 (E.D. Pa.1957); *Rawson v. City of Omaha*, 212 Neb. 159, 322 N.W.2d 381, 385 (1982); *In re Dragonas' Estate*, 35 Misc.2d 300, 230 N.Y.S.2d 54, 55 (Sur.Ct.1962). Here, the trial court found a clear moral obligation on the part of the Mattinglys to compensate the pool owners for their injuries:

After observing the demeanor of the Mattingly brothers and their key employees, the Court believes they felt they had an admirable obligation toward their customers founded on a genuine feeling of remorse because of their inability to properly satisfy their customers. Such

responsible behavior by a business toward its customers is commended.
I App. 62. We cannot say that the trial judge's finding was clearly erroneous; we agree with his views.

In addition, we believe that the trial court was not clearly in error in determining that under Kansas law, the Mattinglys were also *legally* obligated to the pool owners. *See* I App. 61. In *F. Hammer Paint Co. v. Glover*, 47 Kan. 15, 27 P. 130 (1891), the Kansas Supreme Court found that an agreement by a house painter to repair an unsatisfactory paint job caused by defective paint created a legal obligation on the painter's part for which he could recover damages from the manufacturer:

> In all cases where the defendant personally agreed to repaint, upon request to do so, *an actual liability against him exists*, which can be enforced in the way of damages, if he refuses to perform. If the plaintiff's breach of the warranty has involved the defendant in a legal liability to pay money or to incur expense to the parties for whom he did work, to relieve himself against the effects of the bad paint, such liability or expense, whether paid or not, constitute elements of damages which the defendant was entitled to recover.

*Id.* at 131 (emphasis added).

Moreover, we do not believe that a legal claim must be unquestionably unavoidable in order for it to create a "legal obligation." Rather, "when one, to protect his own interest pays a debt which he honestly believes must be paid to accomplish that purpose, ... he cannot be held to be a mere volunteer, even though it may afterwords appear the payment was unnecessary." *Mosher v. Conway*, 45 Ariz. 463, 46 P.2d

110, 113 (1935); *Trinity Universal Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 246 Ark. 1021, 441 S.W.2d 95, 98 n. 2 (1969). *See also Ragan v. Kelley*, 180 Md. 324, 24 A.2d 289, 295 (App.1942) ("A person who has paid a debt under the colorable obligation to do so, or under an honest belief that he is bound, or who mistakenly but in good faith believes he is liable, will be subrogated."); *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 277 N.C. 216, 176 S.E.2d 751, 755–56 (1970) (quoting *Journal Publishing Co. v. Barber*, 165 N.C. 478, 81 S.E. 694 (1914)) ("'[T]hough the party who makes the payment may, in fact, have no real or valid interest to protect, he may yet be subrogated when he acts in good faith, in the belief that he had such interest.'"); *Restatement of Restitution* § 78 (1937) ("A person who with another became subject to an obligation or supposed obligation upon which, as between the two, the other had a prior duty of performance, and who has made payment thereon although the other had a defense thereto ... is entitled to restitution if he becomes subject to the obligation ... because of the fault of the other and, if in making payment, he acted (i) in the discharge of his own duty to the creditor, or (ii) in the justifiable belief that such duty existed....").[5]

Nonetheless, Beatrice strenuously argues that the Mattinglys' affirmation of legal liability was not made in good faith or under an honest belief that they were liable. Because the Mattinglys were aware that they had two defenses to the pool owners' claims—a statute of limitations defense and a disclaimer in their contract with the pool owners—they could not have had any "justifiable belief" that a duty to compensate the pool owners existed. As a

---

**5.** We recognize that the cases cited in support of the proposition that a legal claim need not be unequivocally unavoidable to be a legal obligation involve claims for subrogation rather than claims for indemnification. However, under the circumstances of this case, we do not believe this distinction is significant. The trial court carefully examined the pool owners' claims and found them to be "reasonable, accurate and fair." I App. 61. Furthermore, the court delineated a procedure requiring the plaintiffs' counsel, within sixty days after the

payment of the judgment "to make a report to the [district] Court by affidavit, showing that checks were mailed to the individual owners." I App. 78–79. Because of the certainty of the claims, and because the process of distribution set up by the court ensures that the pool owners will be compensated soon after the judgment is paid by Beatrice, the distinction between subrogation—where the debt has been paid and the payor seeks restitution—and indemnification—where obligations that may arise will be paid by the indemnitor—becomes irrelevant.

result, Beatrice concludes, the Mattinglys are not entitled to indemnification.

"A person who has become secondarily liable upon a transaction ... because of the fault of another is entitled to restitution from the other if he performs a duty owed by him to the creditor, even though before such performance the duty of the other has terminated." *Restatement of Restitution* § 78, comment c (1937). *See also Restatement of Restitution* § 78, illustration 6 (1937). Moreover, "[t]he duty of reimbursement arises from the payment even if the payor kept alive the duty against himself by making promises to pay, obtaining extensions, or changing the State of residence." *Id.* Where a claim is paid with knowledge of a defense available to both parties, however, the payor is not entitled to restitution for such payment. *Restatement of Restitution* § 78, comment g (1937). Therefore, if a valid statute of limitations defense was available to both the Mattinglys and Beatrice against the pool owners at the time the Mattinglys agreed to waive any statute of limitations defense in exchange for forebearance of suit by the pool owners, then the Mattinglys are not entitled to recover damages for their liability.

We are unable to determine from the trial court's findings and the record whether a valid statute of limitations defense was available to the Mattinglys and Beatrice at the time it was waived by the Mattinglys. The statute of limitations for contract actions in both Kansas and Oklahoma is five years. *See* Kan.Stat.Ann. § 60–511(1) (1983); Okla.Stat. 12 § 95(1) (1982). Claims by the pool owners would have arisen sometime between March 1974,

when the Mattinglys began using Beatrice's product, and 1978, when Mattingly, Inc. ceased its operations. From our examination of the record, it appears that the letters waiving any statute of limitations defense were sent out between August 1979 and April 1982. *See, e.g.,* III App. 880–83; IV App. 984; IV App. 985–95. Consequently, it is conceivable that the statute of limitations could have run on some of the claims. At the same time, the record also demonstrates that representations were made by the Mattinglys, at least in some instances, to repair the defective pool coverings. *See, e.g.,* Ex. 804. These representations may have had the effect of tolling the statute of limitations.

■ In sum, we find it necessary to vacate the $393,270 and $260,131 awards for pool owner's claims and remand this issue to the trial court to determine whether a valid statute of limitations defense could have been asserted against claims by the pool owners by both the Mattinglys and Beatrice prior to the Mattinglys waiver of the defense. The court should make further findings and hold any hearings it deems necessary on this issue.[6]

## B. PUNITIVE DAMAGES

### (1) The cross-appeal on punitive damages

The Mattinglys' sole claim on their cross appeal concerns punitive damages.

In awarding punitive damages, the trial judge cited *Slough v. J.I. Case Co.,* 8 Kan. App.2d 104, 650 P.2d 729 (1982), for its "discussion of the distinction between higher punitive damage awards where the de-

---

6. Beatrice's argument with respect to the contractual disclaimer is untenable. Because the defense of the Mattinglys' contractual disclaimer was never available to Beatrice, it cannot complain that the Mattinglys refused to assert it for Beatrice's benefit. *See, e.g., Iowa State Ins. Co. v. Missouri S. Ry. Co.,* 223 Mo.App. 148, 9 S.W.2d 255 (1928). There, the plaintiff settled a fire insurance claim even though it may have been able to assert a defense that "the policy had become void by reason of the dwelling house being unoccupied for a period of ten days." *Id.* at 255. When the defendant argued that the claim could not be subrogated because

the plaintiff could have asserted a defense to it, the court responded:

> Plaintiff is in no sense a volunteer. It had an interest in getting settled the claim of the insured arising from the fire loss. It may have preferred to compromise the claim rather than suffer a lawsuit and depend on the theory that the policy of the insured was rendered void by nonoccupancy. *Plaintiff was under no obligation to defendant, and should not be compelled to resist a claim in order to save defendant harmless.*

*Id.* at 256 (emphasis added).

fendant's wrongdoing endangered persons' physical security or was particularly egregious, and lower punitive damages awards where defendant's conduct was neither life-endangering nor flagrant." Mem. at 73–74. The Mattinglys argue that the factor of personal injuries is not among the standards the trial judge should have applied in determining the amount of the punitive damages award. Appellants' Opening Brief at 20.

"[T]he circumstances under which punitive damages are available in a diversity case are governed by state law, as are the substantive elements upon which an award of punitive damages may be based." *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir.1987) (citations omitted). The federal court's task "is to interpret and apply the law of [Kansas] as [it] believe[s] the [Kansas] Supreme Court would." *Rawson v. Sears, Roebuck & Co.*, 822 F.2d 908, 910–11 (10th Cir.1987). The Kansas Supreme Court stated in *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650, 663 (1979), that:

> In assessing punitive damages the nature, extent and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages....

In *Slough v. J.I. Case Co.*, a Kansas Court of Appeals, in reducing a punitive damages award, distinguished that case from "situations where the wrongdoing of defendant was dangerous to the physical safety and well-being, and in some cases, even to the life of the plaintiff, or where the wrongful or malicious nature of the defendant's activity was much more pronounced than in the instant case." 650 P.2d at 736. The *Slough* court took "special note" that, in that case, "there was a very minimum of evidence to indicate a danger of physical injury to persons as a result of appellant's conduct." *Id.*

■ To the extent that the judge considered "the nature of plaintiffs' damages"

in setting the amount of punitive damages, Mem. at 77, such consideration was proper. The Kansas courts have "clearly ruled that the only factors relevant to a punitive damage award are those involving 'the quality of the character of the tortious act itself.' " *O'Gilvie*, 821 F.2d at 1449, *quoting Ettus v. Orkin Exterminating Co.*, 233 Kan. 555, 665 P.2d 730, 741 (1983). The presence or absence of potential for personal injury in a particular course of conduct involves "the quality of the character of the tortious act itself," *Ettus*, 665 P.2d at 741, because, as *Slough* suggests, it is one of the factors used to assess "the nature, extent and enormity" of a tortious act. *Henderson v. Hassur*, 594 P.2d at 663.

The potential for endangering human life is also relevant to the need to deter similar conduct by others and is one of the "circumstances attending the transaction involved" and a "mitigating circumstance[ ]," which Kansas law says a judge "should" or "may" consider. *Slough*, 650 P.2d at 735, *quoting Henderson v. Hassur*, 594 P.2d at 663. *See also Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, 1061, *cert denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), *quoting Cantrell v. Amarillo Hardware Co.*, 226 Kan. 681, 602 P.2d 1326, 1331 (1979) (*quoting Sanders v. Park Towne, Ltd.*, 2 Kan. App.2d 313, 578 P.2d 1131, 1136 (1978)) (Punitive damages "are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer ... the purpose being to restrain and deter others from the commission of like wrongs."). We hold that the trial judge did not err in his interpretation of Kansas law in considering punitive damages.

**(2) Beatrice's claims of errors in the punitive award**

Beatrice claims the punitive damages award of $1,000,000 in favor of Mattingly, Inc. is improper because its "salesmen" whose conduct it says forms the basis of the punitive damages award, Gurkovic, Holman and Butch, were not in positions of managerial and policy-making responsibili-

ty within Beatrice. Appellee's Opening Brief at 41–44.

In *Kline v. Multi–Media Cablevision, Inc.,* 233 Kan. 988, 666 P.2d 711 (1983), the Kansas Supreme Court adopted the "complicity rule" of the Restatement (Second) of Torts, § 909 (1977), which the Kansas Court restated as to corporations as follows:

> A corporation is not liable for punitive damages for an employee's tortious acts committed within the scope of his employment unless (a) the corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting in the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee.

666 P.2d at 716. In applying this test in *Eagan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), the California Supreme Court stated:

> The determination whether employees act in a managerial capacity . . . does not necessarily hinge on their 'level' in the corporate heirarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.

620 P.2d at 148. *Accord, Plains Resources, Inc. v. Gable,* 235 Kan. 580, 682 P.2d 653, 665 (1984) ("[I]t could be argued Higgins, as the top company man on the drilling site with no supervision in the state of Kansas, was in a managerial position."). *See also Malandris v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1175 n. 17 (10th Cir.1981) (en banc), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983) (actions of a local manager are sufficient under § 909 to impose punitive damages against the employer-corporation where it delegates a great deal of authority to its local branch managers).

The trial court's findings and the record demonstrate that the punitive damages award was not in error under the § 909 analysis. *Kline,* 666 P.2d at 716. Beatrice delegated to Farboil's general management broad discretion in the developing, testing, and marketing of Marble Plastic and other products.[7] Using this delegation of corporate authority, the Farboil management personnel engaged in documented acts, within the scope of their authority, which were found to have brought the termination of the Mattingly companies.

The trial court found that Farboil failed to adequately field test the products so as to discover the defects. Mem. at 6, 13, 25–26. The judge found gross negligence in such conduct. Mem. at 75. Farboil falsely represented that the pool coating products were the result of years of research and development when Farboil actually had no experience with the vagaries of swimming pool coatings before it began producing Marble Plastic for sale in 1972. Mem. at 9–10. In 1974 the clear topcoat (157E) was introduced after laboratory testing rather than extensive field tests. Mem. at 12. The corporate decisions as to policy, content, and form of advertising were directed and controlled by Mel Hendrickson in his capacities as Farboil's National Swimming Pool Director and Sales Manager.[8] The inclusion of untrue state-

---

7. For example, Dr. Harry Wechsler, the President of Beatrice Chemical Division, testified that, pursuant to Beatrice's policies, he gave Farboil's General Manager a great deal of discretion in the development, testing and marketing of Marble Plastic and other products. Deposition of Dr. Harry C. Wechsler, *Delray Pools, Inc. v. Farboil Company,* Case No. 76–2840 CA(L) 01–E (15th Circuit Court, Palm Beach Co., Fla.), taken Apr. 10, 1978, at 6, 10, 15–16, 19–20, 27, 35, 36.

8. Mel Hendrickson, Farboil's National Swimming Pool Director, testified that as National Swimming Pool Director or as Sales Manager, he had "direction and control" over all the people working in the sales and marketing side of the swimming pool coatings division of Farboil. Deposition of Mel Hendrickson, *Mattingly, Inc. v. Beatrice Foods,* Case No. 78–1094 (D. Kan.), taken June 19, 1978, at 34, 38. He testified further that the Sales Manager was in charge of advertising and would have the "prerogative" to

ments in advertisements thus occurred while Hendrickson was (1) a managerial agent for Beatrice who (2) was acting within the scope of his authority. Hendrickson's use of his discretionary authority clearly is within these two principles of § 909.

Beatrice's management agent, Hendrickson, also ratified, approved and participated in actions undertaken by the sales representatives. These sales representatives perpetuated the falsehood as to development and field testing; implied that the Farboil product was used by Sylvan pools; and asserted that only the Mattinglys were complaining and experiencing defective performance of the product. Farboil's sales representatives also enjoyed some managerial discretion within the scope of their authority and this suffices for their actions as local managers to subject Beatrice to corporate liability.[9] *See Malandris*, 703 F.2d at 1175 n. 17. Hendrickson, as the management agent for Farboil, knew and approved of the sales representatives' actions when they continued and amplified the mispresentations made to the Mattinglys. Moreover, Hendrickson actively participated when he also falsely accused the Mattinglys of being the only complainers about Plastic Marble's performance.[10]

We are convinced that on the basis of the record and the findings made the trial court's conclusion that it could award punitive damages was proper under Kansas law and under § 909 of the Restatement of Torts (Second), which the district judge quoted and applied. We note, however, that we are vacating the awards of compensatory damages and remanding them for further proceedings and findings. On remand, the district court shall reconsider the claim for punitive damages in light of the compensatory awards, if any, that are made. *See Slough*, 650 P.2d at 734–35 (enumerating factors to be considered and the weighing of the compensatory damages in the determination of the punitive award).

## IV

## CONCLUSION

Accordingly, the findings as to the liability of defendant Beatrice to plaintiffs for compensatory damages are AFFIRMED for reasons stated in Part II A and II B of this opinion. The setting aside of the accord and satisfaction is AFFIRMED for the reasons stated in Part II C. The findings that defendant Beatrice is liable for punitive damages in the circumstances of this case are AFFIRMED for the reasons stated in Part III B (2). With respect to the cross-appeal of plaintiffs, the claim of error in the standard used by the district court in determining punitive damages is rejected and the findings of the district court on the standards applicable for punitive damages are AFFIRMED.

The awards of compensatory damages to plaintiffs on the claims relating to the pool owners' liabilities and respecting going concern value, liabilities to trade creditors, and incurred past warranty expenses, Mem. at 79–80, are VACATED and remanded for further proceedings and findings as provided in Part III A (1). The award of punitive damages in favor of Plaintiff Mattingly, Inc. and against defendant Beatrice, Mem. at 79, is VACATED and remanded for further proceedings for reconsideration and further findings as to punitive damages, if any, to be awarded against defendant Beatrice in light of the compensatory awards,

---

decide what content and form advertising would take. *Id.* at 43. The record evidence includes Farboil advertising the judge found was false or misleading. XXV R. Pl. Exh. 1, 3; Mem. at 9–10.

**9.** Matt's testimony that as Sales Manager Hendrickson stormed into his July 1976 meeting with Butch and falsely claimed Matt was the only customer receiving a deal from Farboil, XIV R. 908–09, supports the finding that Hendrickson, as Sales Manager or National Swim-

ming Pool Director, ratified the fraudulent conduct of Farboil's sales representatives.

**10.** In addition, Hendrickson's deposition testimony suggests that Gurkovic, Holman and Butch were not the mere "salesmen" Beatrice says they were in its brief, but in fact had at some time or other managerial responsibilities similar to Hendrickson's. Hendrickson Depo., at 43. Thus, their fraudulent conduct in their managerial capacities is attributable to Beatrice for purposes of assessing punitive damages.

if any, made against defendant Beatrice on remand.

IT IS SO ORDERED.