**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                                    Elisabeth A. Shumaker
Clerk                                                                                        Chief Deputy Clerk

November 8, 1999


**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 98-2015, 98-2030, *Equal Employment Opportunity Comm'n v. Wal-Mart Stores, Inc.*
187 F. 3d 1241
Filed on August 23, 1999

The court's slip opinion contains a clerical error on page 20, line 11, the sentence that reads:

> In reviewing the district court's decision to deny punitive relief in this case, the most important factor to consider "is whether the facts indicate a danger of future violations of the Act" by Wal-Mart.

The word "punitive" is corrected to read "injunctive." The corrected sentence appears as follows:

> In reviewing the district court's decision to deny injunctive relief in this case, the most important factor to consider "is whether the facts indicate a danger of future violations of the Act" by Wal-Mart.

Please make the correction to your copy of the opinion.

Sincerely,
Patrick Fisher, Clerk

By: Keith Nelson
Deputy Clerk

**F I L E D**
United States Court of Appeals
Tenth Circuit

**AUG 23 1999**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff - Appellee,

v.

WAL-MART STORES, INC.,

     Defendant - Appellant.

No. 98-2015 and 98-2030

---

EDUARDO AMARO,

     Intervenor - Appellee.

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-95-1200-RLP)**

---

Mark Jarmie (Ned S. Fuller with him on the briefs), Sharp, Jarmie & Scholl, P.A., Albuquerque, New Mexico, for the Appellant.

Lisa J. Banks (C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel and Lorraine C. Davis, Assistant General Counsel with her on the brief), Equal Employment Opportunity Commission, Washington, D.C., for the Appellee.

Brad Hall, Gaddy & Hall, Albuquerque, New Mexico, for the Intervenor - Appellee.

---

Before **PORFILIO**, **MAGILL**[*] and **LUCERO**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

In this appeal, we consider, in light of recent Supreme Court precedent, the evidentiary showing required to recover punitive damages under a vicarious liability theory against an employer accused of violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

## I

In 1991, Wal-Mart hired Eduardo Amaro, with the knowledge that he was hearing-impaired and would need an interpreter in certain circumstances, including training sessions and meetings. On January 19, 1993, Amaro left a mandatory training session requiring viewing of a video tape because there was neither closed-captioning nor an interpreter, and he consequently could not understand the presentation. Amaro's supervisor, Kim Wiggins, ordered him to return to the session, explaining that a co-worker who could finger-spell, but was not a certified "ASL" interpreter, would interpret for him. When Amaro rejected this suggestion, Wiggins reported the matter to the store manager, Robert Dunn.

_____

[*]The Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

The next day, January 20, 1993, Amaro, who had worked in the receiving department, where his responsibilities included scanning and marking labels, was transferred to the maintenance department to perform janitorial duties. Amaro questioned the transfer and again requested an interpreter, but Wiggins responded with a note accusing him of refusing to perform his job. On the following day, January 21, 1993, Wiggins and Amaro, without an interpreter, met with Dunn, who, in a written note, informed Amaro that the transfer was necessary for two reasons: because payroll reductions had reduced the staff in the receiving department, while creating an opening in the maintenance department; and because the maintenance position would "involve less communications and be more simple for you." Appellant's App. at 208. To no avail, Amaro requested an interpreter to explain the transfer, which he viewed as a demotion, and threatened to file a complaint with the EEOC. Dunn thereupon suspended Amaro.

About a week later, with an interpreter present, Dunn met with Amaro, in the presence of two other managerial employees, and again insisted on transferring him to the maintenance crew. Claiming that he was being assigned a dead-end job because he had refused to attend the video training session, Amaro refused the transfer. Dunn immediately terminated Amaro, who then filed a discrimination claim with the EEOC. Although Wal-Mart rehired Amaro in June 1993, the EEOC filed suit on his behalf in October 1993, alleging disability

discrimination and retaliation in violation of the ADA based on Amaro's suspension and termination. Amaro intervened, also asserting ADA claims. [1]

The jury returned a verdict for the plaintiffs, awarding Amaro $3,527.79 in compensatory damages and $75,000 in punitive damages. The district court granted Amaro's motion for attorneys' fees, awarding him a total of $41,063.72 as fees. On appeal, Wal-Mart argues against the award of punitive damages and attorneys' fees. The EEOC cross-appeals, challenging the district court's denial of its motion for equitable relief which sought to secure an injunction barring Wal-Mart from committing future violations of the ADA.

**II**

Wal-Mart appeals the punitive damage award on three grounds. First, Wal-Mart contends that there is insufficient evidence to support a finding that Amaro's suspension and termination, even if discriminatory, were in willful disregard of his rights. Second, Wal-Mart argues that the supervisors who were responsible for Amaro's transfer and termination did not exercise sufficient corporate control to be agents of Wal-Mart and thus their conduct cannot be imputed to their employer for purposes of awarding punitive damages. Even if they were managerial employees, argues Wal-Mart, their conduct was contrary to company

---

[1]Initially, Amaro also asserted various state law claims, which he subsequently dropped.

policy and hence provides no ground for vicarious liability. Finally, Wal-Mart contends that even if the supervisors' conduct justified an award of punitive damages, the actual amount awarded was excessive.

**A**

"Whether sufficient evidence exists to support punitive damages is a question of law reviewed de novo." Fitzgerald v. Mountain States Telephone and Telegraph Co., 68 F.3d 1257, 1262 (10th Cir. 1995) (citing Mason v. Texaco, 948 F.2d 1546, 1560 (10th Cir. 1991)).

The Civil Rights Act of 1991, 105 Stat. 1071, provides that a court may award punitive damages to an ADA plaintiff upon proof that the defendant engaged in "a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The precise burden a plaintiff must carry to prove malice or recklessness for purposes of 42 U.S.C. § 1981a(b)(1) was the source of conflict among the various circuits, see Baty v. Willamette Industries, Inc., 172 F.3d 1232, 1244 n.6 (10th Cir. 1999) (identifying circuit split), until recently resolved by Kolstad v. American Dental Ass'n, 119 S. Ct. 2118 (1999).

The plaintiff in Kolstad, who had recovered back pay in a Title VII gender discrimination suit against her employer, appealed the district court's finding of insufficient evidence to support an award of punitive damages. See Kolstad v.

American Dental Ass'n , 108 F.3d 1431, 1435 (D.C. Cir. 1997) (" Kolstad II ") (discussing Kolstad v. American Dental Ass'n , 912 F. Supp. 13 (D.C.D.C. 1996)) ("Kolstad I" ). On appeal, a panel of the District of Columbia Circuit concluded that because "the jury could reasonably find from the evidence that [the employer] intentionally discriminated against [the plaintiff], the district court should have instructed the jury [to] consider a punitive award" upon the requisite finding of malice or reckless indifference to the plaintiff's right. Kolstad II , 108 F.3d at 1437-38. The en banc court disagreed, requiring a "threshold [showing] of egregiousness for the imposition of punitive damages." Kolstad v. American Dental Ass'n , 139 F.3d 958, 965 (D.C. Cir. 1998) (en banc) (" Kolstad III ").

The Supreme Court granted certiorari, addressing "the circumstances under which a jury may consider a request for punitive damages under § 1981a(b)(1)." Kolstad , 119 S. Ct. at 2123. [2] Discussing the structure of the 1991 Act, the Court noted that although 42 U.S.C. § 1981a(a)(1) provides for "compensatory and punitive damages awards [in] cases of 'intentional discrimination' [s]ection 1981a(b)(1) further qualifies the availability of punitive awards" by requiring proof that the defendant engaged in discriminatory conduct "'with malice or reckless indifference to the federally protected rights of an aggrieved

_____

[2]The punitive damages analysis is the same for Title VII and ADA claims. See 42 U.S.C. 1981(a)(2).

-6-

individual.'" Kolstad , 119 S. Ct. at 2124 (quoting 42 U.S.C. § 1981a(b)(1)).

Agreeing with the proposition that the Act requires two separate standards for

recovery of compensatory and punitive damages, the Court opined that:

> The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination. Section 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) requires plaintiffs to make an additional "demonstrat[ion]" of their eligibility for punitive damages. Congress plainly sought to impose two standards of liability— one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award.

Id. at 2124 (alteration in original).

Having concluded that Congress sought to impose a "higher standard" for

recovery of punitive damages in workplace discrimination cases, the Court

confronted the task of defining just what that standard should be. As traditionally

used, the terms "malice or reckless indifference . . . ultimately focus on the

actor's state of mind." Id. Egregious misconduct may certainly be "evidence of

the requisite mental state [but] § 1981a does not limit plaintiffs to this form of

evidence, and the section does not require a showing of egregious or outrageous

discrimination independent of the employer's state of mind." Id. (citation

omitted). Thus, the proper question is whether the employer engaged in the

conduct alleged with the "knowledge that it may be acting in violation of federal

law." Id. "[A]n employer must at least discriminate in the face of a perceived

-7-

risk that its action will violate federal law to be liable in punitive damages." Id. at 2125.

The Court in Kolstad did not resolve but left for remand the questions of whether the plaintiff had established the requisite mental state, and whether the defendant could be held liable under the agency principles the Court set forth. See id. at 2129-30 ("The parties have not yet had an opportunity to marshal the record evidence in support of their views on the application of agency principles in the instant case, and the en banc majority had no reason to resolve the issue because it concluded that petitioner had failed to demonstrate the requisite 'egregious' misconduct.").

In this case, however, we conclude that the record evidence is sufficient to resolve the questions of intent and agency laid out in Kolstad. Although without the benefit of the Supreme Court's recent clarification of the precise standard for punitive damages, Wal-Mart specifically argued on appeal all of the relevant issues under Kolstad: that Wal-Mart's actions did not amount to malice or reckless indifference under 42 U.S.C. § 1981a(b)(1), see Appellant's Br. at 13-15, and that the relevant supervisory employees were not agents of Wal-Mart so as to permit imposition of vicarious liability, see Appellant's Br. at 11-13. Moreover, although it did not use the particular term "good-faith efforts," Kolstad, 119 S. Ct. at 2128-29, Wal-Mart specifically argued that its preparation and

dissemination of an ADA compliance manual, and the failure of Amaro's supervisors to act in accordance therewith, should defeat the imposition of vicarious liability. See Appellant's Br. at 13. Therefore, we conclude that the parties have had sufficient opportunity to point to record evidence on the relevant questions for us to resolve this appeal under the clarified punitive damages standard of Kolstad. We thus apply the Kolstad standard to the facts before us to determine whether there was sufficient evidence to justify an award of punitive damages against Wal-Mart.

**B**

The evidence shows that Wal-Mart knew Amaro was hearing impaired and employed him with the knowledge that in certain circumstances, including meetings and training sessions, he would need an interpreter. When Amaro refused to attend a training session which he could not understand without the aid of an interpreter, his supervisors not only failed to provide an interpreter, they transferred Amaro from his job as a Receiving Associate to a janitorial position. The next day, the supervisors again failed to provide Amaro an interpreter to discuss his transfer and, in fact, suspended him when he objected to a perceived demotion. When Wal-Mart did provide an interpreter one week later, it was to inform Amaro of his termination. The store manager, who ultimately approved Amaro's suspension, testified that he was familiar with the accommodation

requirements of the ADA and its prohibition against discrimination and retaliation in the workplace. From this evidence, a reasonable jury could have concluded that Wal-Mart intentionally discriminated against Amaro in the face of a perceived risk that its action would violate federal law. [3]

## C

Wal-Mart argues that vicarious liability for punitive damages in this case is improper because the employees who discriminated against Amaro did not occupy positions of managerial control. In resolving this issue of whether to impute to Wal-Mart the conduct of its employees against Amaro, we rely on traditional agency principles as developed by the common law. See Kolstad, 119 S. Ct. at

---

[3]"There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard." Kolstad, 119 S. Ct. at 2125. For example, an employer may be "unaware of the relevant federal prohibition"; it may very well believe that "its discrimination is lawful"; the theory on which an employee premises his claim may be "novel or poorly recognized"; or an employer may "reasonably believe" that it has a bona fide defense to charges of discrimination either because of its occupational qualifications or statutory exceptions. Id. We conclude that none of the Kolstad defenses to punitive damages is applicable here. Wal-Mart's claim that it was aware of the prohibitions against workplace discrimination and that it had a company-wide policy designed to ensure compliance with the requirements of the ADA precludes reliance on the first of these defenses. Wal-Mart cannot argue that the theory upon which the plaintiffs premised their claims is novel or poorly developed, because the ADA is now a matter of settled law; nor has Wal-Mart asserted that it is insulated from punitive damages in this case because of occupational qualifications or statutory exceptions. Finally, our conclusion that Wal-Mart had discriminated against Amaro "in the face of a perceived risk that it would violate federal law" precludes an argument that Wal-Mart had a distinct belief that its discrimination was lawful.

2128 (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 754 (1998), and stating that for purposes of awarding vicarious punitive damages, "our interpretation of Title VII is informed by "the general common law of agency . . . rather than the law of any particular State"). Under the common law, one means by which a plaintiff can prevail in a vicarious liability claim against an employer is to establish that the employer's agent committed a wrong while (1) "serving in a managerial capacity"; and (2) "acting in the scope of employment." Id. at 2128 (quoting Restatement (Second) of Agency § 217 C (1957)).

We consider whether Amaro's supervisors, whose conduct formed the basis for his claim against Wal-Mart, occupied managerial positions. In making this determination, we "review the type of authority" that Wal-Mart gave the employees, and "the amount of discretion" they had in making the decisions they made. Id. (quoting 1 L. Schlueter & K. Redden, Punitive Damages § 4.4(B)(2)(a) at 181 (3d ed. 1995)).

Wiggins testified that at the time she refused to provide Amaro with an interpreter to attend the video training session, she was an assistant manager for Wal-Mart, a position she had occupied for about seven years, and had independent authority to suspend her subordinates. She could also make hiring and firing recommendations. Dunn testified that his responsibilities as store manager included ensuring the smooth operation of the store and making hiring and firing

decisions. By their own testimony, Wiggins and Dunn established that, for purposes of vicarious liability in the context of employment discrimination, they occupied managerial positions. See EEOC v. Gaddis, 733 F.2d 1373, 1380 (10th Cir. 1984) (holding that authority to "hire, fire, discipline or promote, or at least to participate in or recommend such actions," is an indicium of supervisory or managerial capacity) (quoting Miller v. Bank of America, 600 F.2d 211, 213 (9th Cir. 1979)).

Arguing that Wiggins and Dunn did not occupy managerial positions sufficient to justify vicarious liability for punitive damages, Wal-Mart points to our decision in Fitzgerald v. Mountain States Telephone & Telegraph Co., 68 F.3d 1257 (10th Cir. 1995). There, we reversed an award of vicarious punitive damages because although the employee whose conduct was at issue "testified that she was a manager," she was in reality merely "a diversity trainer asked to co-facilitate [a training] session in the absence of another." Id. at 1263. We concluded that she "did not have the typical discretion of a manager, such as the power to make independent decisions regarding personnel matters or determine policy." Id. at 1264. Far from providing support for Wal-Mart's argument, Fitzgerald strengthens our conclusion that, given the authority Wiggins and Dunn

had over certain personnel matters, they occupied positions of managerial control. [4]

We thus consider whether Wiggins and Dunn acted within the scope of their employment. In so doing, we must determine whether their conduct against Amaro is "'the kind [they were] employed to perform'" and whether it was "'actuated, at least in part, by a purpose to serve'" Wal-Mart. Kolstad , 119 S. Ct. at 2128 (quoting Restatement (Second) of Agency § 228(1) at 504). Wiggins and Dunn's testimony about their job functions and responsibilities clearly indicated that they were acting within the scope of their employment when they suspended and terminated Amaro. According to their testimony, the two were employed, in part, to make suspension and termination decisions, and it is clear from the record

_____

[4]Wal-Mart relies heavily on our statement in Fitzgerald that in assessing agency for punitive damages purposes, we look at whether a managerial employee has "some power to set policy for the company." 68 F.3d at 1263 (citing Mattingly, Inc. v. Beatrice Foods Co. , 835 F.2d 1547, 1565 (10th Cir. 1987)). Wal-Mart's focus on the words "power to set policy" overlooks the context of that statement; in the same sentence, we stated that "we look at the stature and authority of the agent to exercise control, discretion and independent judgment over a certain area of a business." Id. This language in Fitzgerald by no means implies the proposition, squarely contrary to our established precedent, that only an executive with power to set policy for all of Wal-Mart's many stores can be an agent of the company. See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1175 n.17 (10th Cir. 1981) (en banc). Rather, Wal-Mart's delegation to Dunn of the power to exercise control and judgment and to set policy for a particular store demonstrates that he was "employed in a managerial capacity." Fitzgerald , 68 F.3d at 1263 (quoting Restatement (Second) of Torts § 909(c) (1979)).

-13-

that their action against Amaro stemmed from a desire to serve their employer, Wal-Mart.

**D**

We have concluded that, while occupying managerial positions and acting within the scope of their employment for Wal-Mart, Wiggins and Dunn engaged in recklessly indifferent intentional discrimination against Amaro so as to warrant an award of punitive damages. Under traditional common law agency principles, such a conclusion would necessarily translate into vicarious liability for Wal-Mart, even if Wal-Mart made "every effort to comply" with the ADA. Kolstad, 119 S. Ct. at 2128. However, "[h]olding employers liable for punitive damages when they engage in good faith efforts to comply with Title VII" and other antidiscrimination statutes like the ADA may violate the basic principle that it is "'improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously.'" Id. at 2128-29 (quoting Restatement (Second) of Torts § 909 at 468 cmt. b). A rigid application of the common law agency rules of vicarious liability that ignores a defendant's well-intentioned efforts to comply with the requirements of statutes like the ADA and Title VII may also have the perverse effect of "[d]issuading employers from implementing polices to prevent discrimination in the workplace." Id. at 2129. "[T]o avoid undermining the [prophylactic] objectives underlying Title VII," the

Kolstad Court felt "compelled" to modify the common law principles of vicarious liability, holding that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with [federal antidiscrimination laws].'" Id. (quoting Kolstad III, 139 F.3d at 974 (Tatel, J., dissenting)).

We therefore consider whether Wiggins and Dunn's conduct ran contrary to Wal-Mart's good-faith efforts to comply with the ADA. Kolstad provides us no definitive standard for determining what constitutes good-faith compliance with the antidiscrimination requirements of the ADA. It is clear, however, that in modifying the common law rules of vicarious liability to protect employers who make good faith efforts to comply with Title VII, the Court intended to encourage "employers to adopt antidiscrimination policies and to educate their personnel on [federal] prohibitions" against workplace discrimination. Kolstad, 119 S. Ct. at 2129. Thus, the extent to which an employer has adopted antidiscrimination policies and educated its employees about the requirements of the ADA is important in deciding whether it is insulated from vicarious punitive liability. Wal-Mart certainly had a written policy against discrimination, but that alone is not enough. Our review of the record leaves us unconvinced that Wal-

-15-

Mart made a good faith effort to educate its employees about the ADA's prohibitions.

Wiggins testified that it was after her deposition in this case, some three years after Amaro's suspension and termination, that she became aware of "any law requiring employers to make reasonable accommodations to enable qualified employees to do their job," and that she had received no training about disability discrimination. EEOC's App. at 82. Lonnie Quintana, the personnel manager, who was also responsible for training at the store where Amaro worked, testified that during her seven years as a Wal-Mart manager, she had received no training in employment discrimination nor in the requirements of the ADA. She had never discussed the Act with any of the employees under her supervision, and did not have a copy of the Wal-Mart ADA handbook.    See EEOC's App. at 173-75.

Wal-Mart's assertion of a generalized policy of equality and respect for the individual does not demonstrate an implemented good faith policy of educating employees on the Act's accommodation and nondiscrimination requirements. The evidence demonstrates a broad failure on the part of Wal-Mart to educate its employees, especially its supervisors, on the requirements of the ADA, and to prevent discrimination in the workplace. We therefore conclude that given the facts of this case, Wal-Mart enjoys no protection from vicarious punitive liability for the conduct of its managerial agents against Amaro.

**E**

Wal-Mart argues, however, that even if an award of punitive damages was warranted in this case, the award was excessive. The abuse of discretion standard applies to our review of a district court's decision not to reduce a punitive damage award as excessive. See Garrick v. City and County of Denver, 652 F.2d 969, 971 (10th Cir. 1981).

We have expressed a preference for not disturbing a jury's award of damages unless the award is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." Malandris v. Merrill Lynch, 703 F.2d 1152, 1168 (10th Cir. 1981). We have thus upheld a punitive damage award of $70,000 in a case in which the jury also found the defendant liable for $20,500 in compensatory damages for violating the plaintiff's civil rights. See Garrick, 652 F.2d at 972 (affirming punitive damage award as reasonable where there was ample evidence from which the jury could have concluded that the defendant, in violation of 42 U.S.C. § 1983, engaged in "oppressive official conduct").

The ratio between punitive and compensatory damages in this case is certainly greater than the ratio in Garrick, but that alone does not require reduction. The reasonableness of the punitive award is buttressed by the fact that the statute Wal-Mart was found to have violated caps punitive awards for an

employer of Wal-Mart's size at $300,000. See 42 U.S.C. § 1981a(b)(3)(D). The award in this case falls within the range that Congress has determined to be reasonable, thus undermining Wal-Mart's argument. See Baty v. Willamette Industries, Inc., 172 F.3d 1232, 1245 (10th Cir. 1999) (rejecting argument that award of maximum under § 1981a statutory cap is excessive). Given the intentional and flagrant violation of the ADA in this case, the award of $75,000, one-fourth the statutory maximum, does not shock our judicial conscience.

**III**

Wal-Mart next challenges the district court's award of attorneys' fees to Amaro. Amaro argues that we have no jurisdiction to consider Wal-Mart's appeal of this issue because no timely notice of appeal was filed. Although Wal-Mart clearly filed a timely notice of appeal of the underlying judgment, the district court did not order the award of attorneys' fees until after the filing of this notice. No supplemental notice was filed on the attorneys' fees issue. See Utah Women's Clinic, Inc. v. Leavitt, 75 F.3d 564, 567 (10th Cir. 1995) ("The Supreme Court has held that the question of attorney's fees and costs are collateral to and separate from a decision on the merits.").

Wal-Mart counters that its initial challenge to the substantive decision necessarily implies a challenge to any attorneys' fees award against it as well, and

thus its initial notice of appeal represented a premature notice of appeal as to the attorneys' fees issue that ripened once the attorneys' fees order became final.

We agree with Amaro, and with the reasoning of our unpublished decision in Bozner v. Sweetwater County School Dist. Number One, 1997 WL 165168 at *1 n.1 (10th Cir. Apr. 9, 1997), that a supplemental notice of appeal is required for us to have jurisdiction over an attorneys' fees issue that becomes final subsequent to the initial notice of appeal. See Utah Women's Clinic, 75 F.3d at 568-69; 16A Charles A. Wright et al., Federal Practice and Procedure 3949.4 at 65-66 (2d ed. 1996). Lewis v. B.F. Goodrich Co., 850 F.2d 641 (10th Cir. 1988), is not to the contrary. That case stands for the proposition that "when a district court has adjudicated all remaining outstanding claims before this appellate court acts to dismiss the appeal," then Fed. R. App. P. 4(a)(2) operates to ripen a prematurely filed notice of appeal and thereby save the appeal. See id. at 645. We decline to extend that reasoning to the distinct situation of a district court's decision entering a subsequent separate and collateral order regarding attorneys' fees. See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202 (1988) (holding that unresolved issue of attorneys' fees does not prevent the judgment on the merits from becoming final); Utah Women's Clinic, 75 F.3d at 566-67 (same).

Therefore, although the parties have briefed issues regarding attorneys' fees, we have no jurisdiction over those issues and do not reach them.

# IV

We finally consider the EEOC's claim that the district court erred in refusing to grant the Commission's motion for equitable relief. That motion asked the court to enjoin Wal-Mart from transferring, suspending or terminating qualified individuals, including those with hearing impairment, at its stores in New Mexico. The EEOC also sought a court order requiring Wal-Mart to, inter alia, train its supervisors about the requirements of the ADA.

"We review a denial of injunctive relief for abuse of discretion." Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997). Congress made injunctive relief available to plaintiffs asserting intentional employment discrimination. See 42 U.S.C. § 2000e-5(g)(1). In reviewing the district court's decision to deny injunctive relief in this case, the most important factor to consider "is whether the facts indicate a danger of future violations of the Act" by Wal-Mart. To satisfy the court that relief is needed, EEOC must demonstrate that "'there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The [district court's] decision is based on all the circumstances; [its] discretion is necessarily broad and a strong showing of abuse must be made to reverse it.'" Id. (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), and discussing the standard for grant of injunctive relief in ADA cases).

Applying this standard in Cheyenne Mountain, we concluded that injunctive relief was required because there were sufficient reasons to believe the defendant would continue to enforce a drug testing policy that the district court had found to be violative of the ADA. Analyzing the facts of this case under the same standard, we agree with the district court that the EEOC has failed to show anything more than a mere possibility of recurrent violations of the ADA by Wal-Mart so as to warrant a grant of injunctive relief.

**AFFIRMED.**