**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

YVONNE FLITTON,

  Plaintiff–Appellant,

v.

PRIMARY RESIDENTIAL
MORTGAGE, INC.

  Defendant–Appellee.

No. 06-4048
(D.C. No. 2:03-CV-00481 TS)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **MURPHY**, and **GORSUCH**, Circuit Judges.

Yvonne Flitton brought suit against her former employer, Primary

Residential Mortgage, Inc. ("PRMI"), alleging retaliatory and discriminatory

termination in violation of Title VII, and seeking both compensatory and punitive

damages. The case proceeded to trial. At the close of Flitton's case, PRMI filed

a motion for judgment as a matter of law ("JMOL"). The district court granted

PRMI's motion with respect to the discrimination and punitive damages claims,

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

but denied it with respect to the retaliation claim. After the jury found for Flitton on her retaliation claim, however, the court granted PRMI's renewed motion for JMOL. Flitton appeals the dismissal of all three claims. Assuming jurisdiction under 18 U.S.C. § 1291, we **REVERSE** with respect to each.

**I**

**A**

In July 2000, PRMI hired Flitton to help manage its wholesale subprime mortgage division, which at the time was headed by Larry Lockwood. Within a few months of her hiring, Lockwood was terminated for performance issues, and Flitton took over the division. She reported to Dave Zitting, the Chief Executive Officer of PRMI, Steve Chapman, the Chief Financial Officer, and Jeff Zitting, executive vice president over marketing.[1]

Flitton and Chapman worked closely on matters relating to the wholesale division; Chapman, however, made Flitton feel uncomfortable. According to Flitton, Chapman would often come into her office uninvited and discuss intimate details of his marriage with her. He once told her, "[I]f it were up to my wife she would be perfectly fine if we never had sex again. And if it were up to me, we would have sex all the time." Chapman complained to her that "he had sexual thoughts quite frequently and how that was really frustrating for him because his

_____

[1] We hereinafter refer to Dave Zitting as "Zitting" and Jeff Zitting by his full name.

2

wife at the time . . . wasn't even sleeping in their bed." He once speculated that "if it were up to women . . . procreation would cease to exist." Unsurprisingly, these discussions were unwelcomed by Flitton.

Also unwelcomed were Chapman's detailed, explicit commentaries on other female employees' dress habits. According to Flitton, Chapman expressed to her his disapproval of specific individuals' thong underwear, breast tattoos, and pierced nipples. Flitton testified that she frequently caught Chapman staring at her chest area, and that upon noticing her catch his unseemly glances in this direction, he told her to button up her shirt. On one occasion, while Flitton was copying papers in front of his office, Chapman yelled her name from several feet away and, in front of her employees, motioned for her to pull up her blouse.

In addition to these sexual references, Chapman made disparaging comments about Flitton's income. He told her he "had never known a woman that made as much money" as her and joked that, in light of her earnings, "maybe he should stay at home and . . . put his wife to work." One day, Chapman informed Flitton that he knew her husband was a broker and must earn some money. Flitton testified that Chapman insinuated she had withheld pertinent information about her household income, as Chapman had previously assumed that her husband was unemployed.

At various points during her employment, Flitton told Zitting about her difficulties in dealing with Chapman, including Chapman's tendency to linger in

her office and bring up inappropriate topics. In August 2002, Flitton had a one-one-one conversation with Zitting in which she reported she had a "dysfunctional relationship" with Chapman. She informed Zitting that Chapman would look at her chest area, ask her to button up her blouse, and make remarks about her compensation. Flitton testified that, in response, Zitting "laughed hysterically" and said, "well, can you blame the guy. He never gets any at home." Zitting then proceeded to draw a cycle for her explaining how Chapman's mind worked. According to Flitton, he provided the following commentary to his diagram:

> [Y]ou know, Steve [Chapman] is a very, very religious man. And because of this, he lives in a very limited world. And . . . in this limited world and due to his religious beliefs . . . it's not within that belief to find a pretty woman attractive. And so what happens is if he sees a beautiful woman that is attractive and he becomes aroused, then he blames that woman for making him feel that way. And so what happens is he takes it out on that person for making him feel that way. And then there is a period of guilt and feeling bad. And so then there may be a period of time where he's nice to you and then the cycle starts all over again.

Zitting concluded, "Yvonne, Steve has had problems with every attractive woman that we've ever hired." At oral argument, PRMI conceded that this conversation, including the drawing of Chapman's "sexual cycle," took place.

Zitting did not investigate Flitton's claims or report them to the Human Resources Director, Stacy Stetner. At trial, Zitting explained that he took no action because Flitton told him she could handle Chapman. Apparently aware that Chapman's difficult behavior continued, Zitting told Flitton and others at a staff meeting in September 2002 that the proper way to deal with Chapman was to

4

put on a "pretend biohazard suit." While in the suit, Zitting said, they could ignore Chapman, and continue to work while simply nodding in agreement with anything he said. After awhile, Zitting stated, Chapman would simply go away.

In October 2002, Chapman and Flitton got into an argument involving the compensation scheme for the wholesale division. Chapman had previously informed Flitton that he wanted the compensation scheme changed, so that employees in the wholesale division would be paid an incentive for yield, or sale, of loans rather than for the production, or closing, of loans. Flitton proceeded to implement the requested change, and by September, she and her employees were paid commissions for selling loans rather than closing them. During an October 9, 2002 meeting with Flitton, Chapman became aware of the change in commission structure and took issue with certain aspects of it. In particular, he was concerned Flitton and her employees had been double-paid on certain loans, by receiving commissions for the closing of these loans prior to the change in compensation scheme, and receiving commissions again for the sale of the same loans after the change.[2] Chapman demanded that Flitton pay back her September incentive bonus. He then asked Flitton what she "needed to make." Flitton took

_____

[2] Although Flitton testified she understood "how he could see it that way," she stated that she "absolutely" did not view the receipt of commissions under the new system as double payment because "when you are in upper level management, you make such little amount on each loan that it's not viewed as though you are being paid on an individual loan. . . . It's an incentive plan to drive the type of behavior you are looking for in someone."

5

offense at the question and responded that her compensation should be tied to results and not need. Chapman proceeded to inform Flitton that he would be capping her salary, and that the maximum commission she could earn in any given month would be $3,000.[3] This cap would have resulted in a sharp decrease in her take-home pay: Flitton's commission pay for the month of October 2002, based on loans from September 2002, would have amounted to $11,400 under the old pay structure and to $8,000 under the new pay structure. Upset by this exchange, Flitton left Chapman's office.

Shortly thereafter, in an email time-stamped Wednesday, October 9, 2002, 5:59 P.M., Chapman wrote Flitton stating that he would "like to continue our meeting and discuss the items that we need to." He proposed "set[ting] up a time that we can sit down with Dave [Zitting] [and] Jeff [Zitting] . . . to discuss the monthly review." Flitton responded by email the next afternoon:[4]

> I feel like you were completely out of line in so many areas. I am speechless that you would suggest that I go a month without incentive. The fact that you asked me how much income I need to make is completely irrelevant. I don't think it is wise that we sit down again in the future without someone else present. I feel discriminated against by your almost regular comments regarding my

---

[3] Flitton's base pay of $5,000 per month remained unaffected by the change. Chapman admitted at trial that he understood the new commission pay structure implemented by Flitton decreased her September 2002 commissions.

[4] At trial, Flitton testified that she had no reason to believe the times listed on her emails were inaccurate. Zitting, however, testified that because the servers for PRMI's network were located on the East Coast, the timestamps may have been two hours ahead.

6

income and it is becoming increasingly uncomfortable. This is not a new subject and your comments reach back well beyond a year ago. I honestly feel that if I were a man that you would have no issue with my income level at all.
[. . . ]
I actually came in this morning and left due to the fact that I just could not get over your flagrant suggestion to cap my income and payback September incentive.

Flitton sent an email to Zitting later that afternoon with the subject line "Unsuccessful Bio Hazard." This message states in part:

Bio hazard did not work yesterday. Steve [Chapman] is way out of line and his only impact on me is fear and de-motivation. . . . Interaction with Steve is very counterproductive. . . . He suggested that I pay September incentive back over a period of time because his simplistic view actually sees the initial loan yield month v. production as "double-paying" on the same loans. This is absurd. An individual at my level isn't paid on specific loans. . . . With this new plan [I implemented], I actually make less! . . . I will not put myself in a situation where I am not shown the same respect that I have demonstrated. . . . He actually asked me what I "needed" to make with the suggestion to cap my income.
[. . . ]
I don't think it is right to simply say . . . "that's just Steve!" I am mostly tired of his continual remarks regarding my income and his obvious attempts to reduce it. His attitude toward women is very transparent. I know if I were a man this would not be an issue.

On the morning of Thursday, October 10, 2002, Zitting and Chapman approached Scott Petersen in his office. Zitting and Chapman had not seen Flitton at work that day and thought she might have quit her position. They asked Petersen to fill her post, and told him that even if Flitton returned to work the next day, she was "most likely" going to be fired.

On Friday, October 11, 2002, Flitton returned to work and was terminated

7

by Zitting. Petersen was chosen to run the wholesale division in her stead. At trial, Zitting testified that he first learned of the October 9 meeting from Chapman and became "extremely concerned." When he did not see Flitton at work the next day, he assumed that she had quit. Zitting went on to testify that he received Flitton's email that evening, and that it was a factor in his decision to terminate her. In response to counsel's question, "[A]fter you read and reviewed [Flitton's email], did you make any decisions with respect to Ms. Flitton's employment either that night or whenever, the next morning?" Zitting stated, "Yes. I determined that – I determined that I needed to terminate [Flitton's] employment. I felt it was too great a risk for the division and I felt that this was the straw that broke the camel's back."

At trial, PRMI asserted four main reasons for Flitton's termination: (1) Flitton's receipt of "double payment" of commissions due to the changed incentive pay plan, (2) the profitability and risk-management of the wholesale division under Flitton, (3) the division's large overhead in relation to its revenue, and (4) Flitton's "inability to communicate." Chapman testified that he had concerns about the financial stability of the wholesale division under Flitton. Flitton, however, presented evidence and testimony disputing PRMI's characterization of the wholesale division's profitability and overhead costs. In particular, she points to Chapman's own testimony that he pushed $300,000 of profits from fiscal year 2002 into previous years on the balance sheets he

8

prepared after her termination, which made her division appear less profitable than it actually was. In contrast to their alleged concerns, Chapman sent Flitton an email congratulating her on "another great month" in August 2002, and Zitting offered effusive and continuous praise of Flitton's division during a September 2002 luncheon.

**B**

Within a few months of her termination, Flitton brought suit against PRMI under Title VII, alleging claims of discriminatory and retaliatory termination, and seeking punitive damages. These claims proceeded to trial. At the close of Flitton's case, PRMI filed a motion for JMOL pursuant to Fed. R. Civ. P. 50(a). Reasoning as follows, the district court granted the motion with respect to the discrimination claim:

> In order to prevail at trial on Plaintiff's Title VII gender discrimination claim, she must establish both that Defendant discharged her, and that her gender was a motivating factor in the Defendant's decision. The Court finds that there has been no evidence provided other than Plaintiff's own subjective belief that gender was a motivating factor in her termination, which is insufficient to satisfy the elements just noted.
>
> Defendant called a number of witnesses, none of which expressed any view that they witnessed or experienced any gender discrimination on the part of Defendant. Evidence did indicate that Plaintiff's predecessor, who was male, was terminated by Defendant for poor performance – the same reasons given by Defendant for Plaintiff's termination.

In addition, the district court noted Flitton's testimony that the salary "cap"

9

would apply to all incentive-paid employees in the wholesale division – males and females alike. With respect to the punitive damages claim, the court found "that Plaintiff has produced no legally sufficient evidence whatsoever that Defendant acted with either malice or with reckless indifference to Plaintiff's federally protected rights," and granted PRMI's motion. The court declined to grant JMOL with respect to Flitton's retaliation claim. That claim proceeded to the jury, which found in her favor.

PRMI then filed a renewed motion for JMOL. After considering the evidence from trial, the court granted judgment to PRMI and vacated the jury verdict in favor of Flitton. The court found that neither the August 2002 conversation between Flitton and Zitting nor the October 10, 2002 emails from Flitton to Chapman and Zitting supported the retaliation claim. With respect to the former, the court stated, "the only items [from the August conversation] which could arguably be considered to touch upon gender were that Chapman would look at her chest area a lot, and asked her to button up her blouse" (emphasis in original). Concluding that Flitton's statements evidenced a mere "personal grievance" against Chapman, the court held that her comments to Zitting did not suffice as a complaint against discrimination. With respect to the emails, the court found that, notwithstanding Zitting's testimony that Flitton's email of October 10, 2002 was the "straw that broke the camel's back," the record clearly established Zitting made his decision to terminate Flitton before receiving her

10

email. The court's finding on this point relied largely on the testimony of Scott Petersen, whom it described as "a disinterested witness."

Flitton appeals the dismissal of all three of her claims.

## II

We review de novo the district court's dismissal of Flitton's gender discrimination and punitive damages claims pursuant to Rule 50(a), as well as its dismissal of her retaliation claims under Rule 50(b). See Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999) (Rule 50(a) motions); Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1268 (10th Cir. 2000) (Rule 50(b) motions). Under Rule 50, a court may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Dismissal of a claim is proper "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1339 (10th Cir.1998) (quotation and citation omitted). In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000), the Supreme Court clarified:

> [I]n entertaining a motion for judgment as a matter of law . . . the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

-11-

functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

(internal citations and quotations omitted). With these instructions in mind, we turn to Flitton's appeal.

## A

Flitton first claims that the district court erred in dismissing her discriminatory termination claim at the close of the presentation of her case. On the merits of a plaintiff's case, the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), does not control. Instead, the central issue is whether the adverse employment action was motivated by a plaintiff's membership in a protected class. See Stewart v. Adolph Coors Co., 217 F.3d 1285, 1288 (10th Cir. 2000). Nonetheless, in considering this ultimate question of discrimination, it is useful to examine the McDonnell Douglas factors – a plaintiff's prima facie case, an employer's proffered reasons for adverse action, and the plaintiff's showing of pretext – as these elements will provide guidance as to "whether judgment as a matter of law is appropriate in any particular case." Reeves, 530 U.S. at 148; Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir. 1990) ("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment,

-12-

and for directed verdict").  In some, but not all, cases, "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability."  Id. at 149.

To establish a prima facie case of discrimination, a plaintiff need only show that:  (1) She belongs to a protected class; (2) She was qualified for her job; (3) Despite her qualifications, she was discharged; and (4) The job was not eliminated after her discharge.  Kendrick v. Penske Tranp. Servs., Inc., 220 F.3d 1220, 1229 (2000).  PRMI does not dispute that Flitton belongs to a protected class and was terminated, or that her position remained open after her discharge. It does, however, contest Flitton's job qualification by asserting that she performed poorly in her position.  Subjective assessments of a plaintiff's performance, however, cannot be used to defeat a prima facie case.  See EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1192 (10th Cir. 2000) ("[A]n employer may not defeat a plaintiff's prima facie case by asserting that the plaintiff failed to satisfy subjective qualifications.") (quotation and citation omitted).  Moreover, a plaintiff's burden of showing job qualification is not onerous:  She may satisfy this prong of her prima facie case merely "by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."  Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470

-13-

(10th Cir. 1992). Flitton served as head of PRMI's wholesale division for over two years, and presented evidence that her supervisors praised her work. She has more than adequately established her qualification for her position.

PRMI offered four reasons for its termination of Flitton: (1) the division's large overhead in relation to its revenue, (2) the profitability and risk-management of the wholesale division under Flitton, (3) Flitton's receipt of "double payment" of commissions due to the changed incentive pay plan, and (4) Flitton's "inability to communicate." Flitton may show that these reasons are pretextual by casting doubt on whether PRMI "honestly believed those reasons and acted in good faith upon those beliefs." Rivera v. City and County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation and alterations omitted). To prove a discriminatory motive, however, she need neither prove that all the employer's proffered reasons are false, nor show that discrimination was the "sole motivating factor in the employment decision." Elmore v. Capstan, Inc., 58 F.3d 525, 530 (10th Cir. 1995) (quotation and citation omitted). "Instead, the employee must prove only that a discriminatory factor was also a reason for the employers decision and that it was the factor that made a difference" – or, in other words, that it was a motivating factor. Id. (quotations and citation omitted).

Our review of the record leads us to conclude that the district court failed to draw all reasonable inferences in Flitton's favor and did not disregard all evidence favorable to PRMI that the jury was not required to believe. See

Reeves, 530 U.S. at 150-51. At trial, Flitton offered numerous pieces of evidence showing that PRMI's reasons were unworthy of credence or even demonstrative of discrimination. To begin with, Flitton's alleged communications problems arose primarily from her strained relationship with Chapman. As Zitting testified at trial, his decision was largely based on his impression that Flitton's relationship with Chapman was "deteriorating rapidly." He explained he had a "major concern" that Flitton was "unwilling to communicate with the CFO of the company." Yet the evidence at trial reveals that Zitting understood that Flitton and Chapman's relationship was strained in part because Chapman could not work well with women. In August 2002, just two months before Flitton's termination, Zitting expressly told Flitton that Chapman had difficulty dealing with her because she was an attractive woman. In response to Flitton's complaints about Chapman's behavior, Zitting drew Flitton the "sexual cycle" diagram, in which Chapman's varying degrees of guilt and attraction caused him to treat attractive women differently than men. Zitting attributed Flitton's complaints to the operation of this cycle – including her complaints that she found it difficult to meet with Chapman, that Chapman stared at her breasts, and that Chapman made sarcastic remarks about her income. Because Flitton's inability to get along with Chapman weighed heavily on Zitting's decision to terminate her, and because undisputed evidence demonstrates that Zitting attributed Chapman and Flitton's problematic relationship to the fact that Flitton was an attractive woman, a

-15-

reasonable jury could conclude Flitton's gender was a motivating factor in her termination – even if it also believed some of PRMI's other proffered reasons. See Elmore, 58 F.3d at 530.

Our determination that the district court erred in dismissing Flitton's discrimination claim does not rest on the court's failure to draw these reasonable inferences in her favor, alone. It also failed to credit evidence offered by Flitton that cast doubt on whether PRMI honestly believed its other proffered reasons for her termination. Regarding the profitability of the wholesale division, Chapman testified that the profit and loss statements he prepared after Flitton's termination showed only $12,000 in profits for 2002 because he had intentionally pushed $300,000 of the profits from 2002 into previous years. A reasonable jury could conclude, based on this fact, that PRMI did not honestly believe the wholesale division was insufficiently profitable. Moreover, Flitton testified that her senior managers – including Chapman and Zitting – gave her consistent and effusive praise and expressed excitement about her division from August 2002 until the time she was fired. On August 1, 2002, Chapman sent Flitton an email congratulating her on "another great month," and during a September 2002 luncheon, Zitting highly praised Flitton's performance. This evidence weakens PRMI's assertion that it had deep-seated concerns about Flitton's management of the wholesale division.

Finally, the district court failed to accord any weight to Chapman's

sarcastic and derogatory remarks about Flitton's income as a woman.   While these comments, alone, may not suffice to show discrimination, a rational juror could find them adequate to support Flitton's claim of gender discrimination on consideration of the record as a whole.[5]  See Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1114 (10th Cir. 2005) (acknowledging that isolated comments are insufficient in themselves to prove discrimination, but stating that a jury could find discrimination when considering the prima facie case and a plaintiff's showing of pretext, "coupled with the comments").

Accordingly, we reverse the dismissal of Flitton's gender discrimination claim.

**B**

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because that employee has opposed discrimination in the workplace.  42 U.S.C. § 2000e-3(a).   To make out a prima

---

[5]  We realize that Zitting, not Chapman, was the ultimate decisionmaker in this case.  However, our caselaw permits us to impute the biases of subordinates to an ultimate decisionmaker if "the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action."  See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 487 (10th Cir. 2006).  The record reveals that the meeting between Chapman and Flitton, and Chapman's report of that meeting to Zitting, influenced Zitting's decision to terminate Flitton.  Petersen's testimony that Zitting and Chapman approached him together on October 10, 2002, to discuss the possibility of Flitton's termination also supports the view that Chapman and Zitting acted in tandem – or, at the very least, that Zitting was persuaded to fire Flitton based on the actions of Chapman.

facie case of retaliation, a plaintiff must show that: (1) She engaged in protected activity; (2) The employer took an adverse employment action against her; and (3) There exists a causal connection between the protected activity and the adverse action. Aquilino v. Univ. of Kan., 268 F.3d 930, 933 (10th Cir. 2001). Flitton's October 10, 2002 email to Zitting lists a number of problems she had with Chapman's behavior and concludes, "[Chapman's] attitude toward women is very transparent. I know if I were a man this would not be an issue." This complaint of Chapman's disparate treatment of women constitutes protected activity and satisfies the first prong of her prima facie case. Flitton's termination was an adverse employment action, thus satisfying the second prong. On the third prong, the district court held as a matter of law that no causal connection existed between the email and Flitton's termination. Based largely on the testimony of Petersen, the court found that Zitting made the decision to terminate Flitton before receiving the email, that the email only reinforced this prior decision, and that no reasonable juror could find otherwise.

We fail to see how the court reached this conclusion in light of Zitting's testimony that Flitton's email was the "straw that broke the camel's back" with respect to his decision to terminate Flitton. A reasonable juror could construe this statement as evidence that Flitton's email was a motivating factor for Zitting's decision. See Elmore, 58 F.3d at 530 (10th Cir. 1995) (holding that an impermissible reason need not be the sole factor in a decision). Zitting's

-18-

testimony also allows a reasonable juror to find that Zitting received Flitton's email before making his decision to terminate – contrary to the district court's conclusion.

Petersen's testimony does not preclude such a finding. As an initial matter, we do not agree that Petersen was merely a "disinterested witness." Not only did Petersen replace Flitton as head of the wholesale division, the trial transcript reveals a great deal of hostility between Flitton and Petersen. More importantly, however, the district court improperly concluded that Petersen's testimony unambiguously indicated that Zitting and Chapman had already decided to terminate Flitton on the morning of Thursday, October 10, 2002. Petersen testified that Zitting and Chapman told him during the relevant meeting that Flitton would "most likely" be fired – not that she undoubtedly would be fired. Contrary to the district court's conclusion, this testimony could be read as supporting Flitton's contention that a final decision had not been made regarding her employment at the time Zitting read her email. Drawing reasonable inferences in favor of Flitton, and "disregard[ing] all evidence favorable to [PRMI] that the jury is not required to believe," Reeves, 530 U.S. at 151, we conclude that a reasonable jury could find that retaliation was a motivating factor for Flitton's termination. We thus reverse the dismissal of her retaliation claim.

**III**

We now turn to the district court's grant of PRMI's motion for judgment as

a matter of law on Flitton's punitive damages claim. Whether sufficient evidence exists to support punitive damages is a question of law that we review de novo. McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1136 (10th Cir. 2006). Punitive damages are available in Title VII actions only if a plaintiff proves that her employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In Kolstad v. America Dental Ass'n, 527 U.S. 526, 535 (1999), the Supreme Court explained that "malice" or "reckless indifference" does not require "a showing of egregious or outrageous" conduct. Instead, a plaintiff must present proof that the employer acted "in the face of a perceived risk that its actions would violate federal law." Id. at 536.

In EEOC v. Heartway Corp., 466 F.3d 1156, 1169 (10th Cir. 2006), we held that a punitive damages claim may proceed under Kolstad "where (1) there is sufficient evidence for the jury to decide whether an employer intentionally and illegally discriminated on the basis of a disability and (2) there is evidence that the employer knew the requirements of the ADA."[6] (citing EEOC v. Walmart Stores, 187 F.3d 1241 (10th Cir. 1999)). Similarly, in considering the sufficiency of evidence to support a punitive damages award in McInnis, we first analyzed

_____

[6] Although that case addressed a disability discrimination claim, it elaborates on the proper inquiry under Kolstad, which involved punitive damages in a Title VII case.

-20-

whether "a reasonable jury could find that McInnis's termination was illegal retaliation against her federally protected rights for reporting sexual harassment," 458 F.3d at 1137-38, then looked to whether the retaliatory actions were taken "in the face of a perceived risk that such actions would violate federal law," id. at 1138 (quoting Kolstad, 527 U.S. at 543). In both cases, we denied JMOL to employers that engaged in intentional acts of discrimination and testified that they understood their obligations under federal law. See also Juarez v. ACS Gov't Solutions Group, 314 F.3d 1243, 1247 (10th Cir. 2003) (allowing award of punitive damages where evidence of retaliation was coupled with evidence that supervisors received EEO training).

As previously discussed, a reasonable jury could find that gender discrimination and/or retaliation motivated Zitting's decision to terminate Flitton. In an August 2002 meeting that occurred two months before Flitton was fired, Flitton reported problems in her relationship with Chapman to Zitting. Zitting informed Flitton that these problems arose from Chapman's cycle of sexual attraction and resulted in his disparate treatment of attractive women. One day before Flitton was fired, Zitting received an email from Flitton complaining of Chapman's discriminatory treatment – including treatment similar to the kind she had reported to Zitting during their prior meeting. Zitting admitted at trial that his decision to fire Flitton was motivated both by Flitton's email and by Flitton's strained relationship with Chapman.

-21-

Zitting also testified that, as part of his MBA program at the University of Utah, he received six weeks of training on human resource law. He admitted that he was knowledgeable about civil rights in the workplace, and specifically of the civil rights of women in the workplace. This testimony, coupled with evidence or discriminatory and/or retaliatory termination, could lead a reasonable juror to conclude that Zitting acted in the face of a perceived risk that his actions would violate Title VII. McInnis, 458 F.3d at 1137. Moreover, considering that Zitting was the CEO of the company, his actions can form the basis of a punitive damages claim under a theory of direct liability. See id. at 1138 n.4 (explaining that an employer may be held directly liable for punitive damages when the employee taking relevant action is "sufficiently highly ranked"). We therefore reverse the district court's grant of judgment as a matter of law to PRMI on Flitton's punitive damages claim.

## IV

Finally, we consider Flitton's contention that the district court erred in directing that parties exclude testimony and evidence of polygamy and the viewing of pornography by PRMI board members and senior officers.[7] Because we reverse and remand the district court's ruling on gender discrimination and

_____

[7] Parties dispute the extent to which the district court granted PRMI's motion in limine with respect to evidence of polygamy and pornography. Although the lower court's order was somewhat ambiguous, we need not settle this dispute here.

punitive damages, retrial of these issues will necessarily involve a new record. The district court will need to reconsider this evidence in the context of that new record. Fed. R. Evid. 403 balancing can be conducted on that basis.

**V**

We **REVERSE** the dismissal of Flinton's claims of discrimination and for punitive damages, and **REMAND** for trial on those claims. We **REVERSE** the grant of JMOL on the retaliation claim and **REMAND** for entry of judgment on the jury's verdict relating to that claim. We **GRANT** Flitton's motion to supplement the appendix. All other pending motions are **DENIED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge